UNITED STATES of America,
Appellee,

v.

Jack Solomon FOX and Samuel Norber,
Defendants-Appellants.

No. 542, Docket 32037.

United States Court of Appeals
Second Circuit.

Argued June 21, 1968.

Decided Oct. 18, 1968.

Frederick F. Greenman, Jr., Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty. for Southern Dist. of New York, and Pierre N. Leval, Asst. U. S. Atty., on the brief), for appellee.

Joshua N. Koplovitz, New York City (Daniel H. Greenberg, New York City on the brief), for appellants.

Before MOORE and FRIENDLY, Circuit Judges, and BRYAN, District Judge.*

FREDERICK van PELT BRYAN, District Judge:

After trial before Judge Tyler and a jury appellants were each convicted on two counts: first, of knowing possession of 77 cartons of drugs of the value of over $100 stolen from an interstate shipment (18 U.S.C. § 659), and second, of conspiring to receive and transport in interstate commerce stolen goods of a value exceeding $5,000 (18 U.S.C. § 2314). They appeal from the judgments of conviction.

The principal contention on this appeal is that a prearraignment statement given by appellant Fox to F. B. I. agents should not have been admitted in evidence. It is urged that the warnings given to Fox were inadequate under the standards set in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The jury was entitled to find the following facts:

On December 20, 1963 a truck containing some $200,000 of Squibb drugs moving in interstate commerce was hijacked in New York City. In late December or early January 1964 the stolen drugs were stored by Paul DeVito and Anthony Rinaldi in the basement of an empty drug store in Rocky Point, Long Island.

In February, 1964, appellants Fox and Norber jointly borrowed $5,000 from a Detroit bank, ostensibly in order to buy for quick re-sale some distress merchandise then available at bargain prices. The money was placed in Norber's account. On March 3, 1964, Fox and Norber drove to New York in Fox's Ford Econoline truck and checked into a double room at the Travel Lodge Motel in mid-Manhattan.

* Of the Southern District of New York, sitting by designation.

On March 5 Fox drove his truck to the empty drug store in Rocky Point, Long Island, and a portion of the stolen drugs in the basement was loaded into the truck. Fox then drove the truck back to the Manhattan motel. On March 6 DeVito called Fox and Norber in their motel room, asking to speak to "Fox or Sam."

On March 7 Fox and Norber checked out of the motel and drove in Fox's truck toward the Lincoln Tunnel. As they were about to enter the tunnel they were arrested by F. B. I. agents. In the truck were 77 cartons of the stolen drugs worth approximately $14,000. On the top of the cartons was a blue plastic bag containing several Squibb drug price lists, a handwritten inventory of the cartons in the truck, and 11 Squibb invoices showing the prices of several of the items found in the truck. When Fox and Norber were searched, Fox had a slip of paper on which he had written directions to the Rocky Point drug store.

At the end of the Government's case Norber rested. Appellant Fox took the stand. He testified in substance that he was in the barber and beauty supply business in Detroit; that he and Norber had borrowed the $5,000 for the purpose of picking up some merchandise at a close-out; that he had come to New York (where he met Norber by pre-arrangement) to pick up an order of beauty and barber supplies which he collected only after he was arrested and released; that on the night of March 3 and the morning of March 4 he had conferred with a William Marcus, a Detroit drug wholesaler, who introduced him to a man known as "George" ; that on March 4 Fox and George had driven to the Rocky Point drugstore, loaded some drugs and returned to the motel; that on the night of March 4 Fox had stomach cramps and gave the key to his truck to Marcus who took it and returned the truck to Fox that evening emptied of its contents; that the next morning Fox again went to Rocky Point where he met George and gave him a slip of paper from Marcus; that George loaded the truck with cartons and both drove back to the motel and that Fox and Norber were arrested on March 7 with the second load of drugs as they were starting out for Detroit. Fox said he believed the drugs to have been close-out merchandise which had been obtained by Marcus and testified that he did not know that they were stolen.

On cross-examination Fox denied telling the arresting agents that he had been at Rocky Point looking for a racetrack on March 4; that they had asked him any questions about the contents of the truck or that he had told them that he didn't know what the contents were; or, in fact, that he had told them anything.

On rebuttal the Government called McGillicuddy, an F. B. I. Agent, who had been present at the arrest and interrogation of Fox on March 7th. McGillicuddy testified that after the arrest he and agents McGoey and Saunders took Fox to the F. B. I. office in Manhattan, and that, "Agent McGoey advised Fox that he didn't have to make any statement; that any statement that he made could be used in a court of law and he could consult an attorney prior to any question," and that the defendant indicated that he understood the advice given him.

According to McGillicuddy, Fox, after being so advised, was asked about the contents of the truck. Fox said that the truck contained approximately 70 cartons of merchandise and that he was not aware of what the merchandise was; that he didn't know the individuals from whom he had purchased the goods; that when he was asked why he had been in the Rocky Point Area of Long Island on March 4th, he said that he had gone to the Island on the 4th looking for a racetrack; that he hadn't found a racetrack on that day and that he didn't know anybody at Rocky Point.

The appellants challenge the admissibility of the McGillicuddy testimony as to the Fox statements, primarily on the ground that the warnings given to Fox did not satisfy minimal *Miranda* standards.

The Government counters with the claims (1) that no proper objection on

*Miranda* grounds was made at the trial to the admission of this evidence, and (2) that even had proper objection been made, Fox's statements would still have been admissible since "their sole effect was to impeach his credibility on a collateral matter—his trip to Rocky Point and his dealings with Marcus and the mysterious 'George.'" The Government also suggests that "no desirable purpose would be served in extending the prophylactic rules of *Miranda* to exclude the statements at issue here, especially where the warning given was a fair one which fully complied with the law before *Miranda*."

In Miranda v. State of Arizona, the Supreme Court held that

"[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege, and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." 384 U.S. at 478–479, 86 S.Ct. at 1630.

■ Although the interrogation of Fox occurred before the decision in *Miranda,* the trial commenced after the

decision and the *Miranda* standards govern, Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), unless, as the Government argues they do not apply to the facts here.

■ We agree with appellants that the warnings given in the case at bar did not comply with *Miranda* standards.

(1) *Miranda* requires that the accused be told that he has "the right to remain silent." Fox was merely told "he didn't have to make any statement." This is by no means the same thing. It could easily be interpreted to mean that Fox did not have to make a formal statement rather than that he need not answer any questions or say anything at all.

(2) *Miranda* requires that the accused be told that "he has the right to the presence of an attorney," plainly meaning to have an attorney present at the interrogation. Fox was told "he could consult an attorney prior to any question." There was no indication given to him that he had the right to have an attorney present during the interrogation.

(3) Nothing at all was said to Fox about his right to have an attorney appointed prior to questioning if he could not afford one, as *Miranda* requires.

Although the "words of *Miranda* do not constitute a ritualistic formula which must be repeated without variation in order to be effective" and "words which convey the substance of the warning along with the required information are sufficient," United States v. Vanterpool, 394 F.2d 697 (2d Cir., Apr. 29, 1968), the warnings in the case at bar taken as a whole do not convey the substance of the *Miranda* requirements and do not comply with them.[1]

---

1. In United States v. Vanterpool, supra, and United States v. Anderson, 394 F.2d 743 (2d Cir., May 8, 1968), as in the instant case, the warnings were given prior to the decision in *Miranda*. However, the warnings upheld in those cases went much further toward complying with the substance of *Miranda* than those given Fox. In both *Vanterpool* and *Anderson* the defendant was told that he had a right to remain silent. Moreover, in both cases some mention was made of the right to appointed counsel. Finally, the defendant in *Vanterpool* was told that he had "a right to an attorney and to consult with a lawyer at this time," and in *Anderson* that "he had a right to a lawyer at this time."

The Government argues that, even if the rebuttal testimony as to Fox's statement was inadmissible under *Miranda* standards, the objections made by defense counsel at the trial were insufficient to preserve the *Miranda* issues on appeal, citing United States v. Indiviglio, 352 F.2d 276 (2d Cir. 1965) (en banc), cert. denied, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966).

We think that the objections made at trial were sufficient. Both in the robing room and in open court defense counsel directed objections specifically at the rebuttal testimony as to Fox's statements to the agents.

His first objection in the robing room was based on Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). However, when he renewed his objection in open court he called for a voir dire on the "voluntariness" of any post-arrest statements made by Fox. The·trial judge denied the voir dire request but gave him a continuing objection to the McGillicuddy testimony.

Defense counsel's objection as to "voluntariness" was made after McGillicuddy had testified as to the warnings given but before he was allowed to answer any questions as to Fox's statements. Thus, the timing of the objection highlighted its substance. The reliance on "voluntariness" was quite adequate to preserve a *Miranda* objection. Voluntariness is scarcely a limiting term of art which excludes self-incrimination or violation of the *Miranda* rules.[2]

No doubt the repeated objections could have been more accurately phrased. But the refusal of a voir dire tended to foreclose clarification. It would be hypertechnical to call the objections insufficient to preserve such a basic claim as this on appeal. Nor do we feel that United States v. Indiviglio, supra, which is markedly distinguishable on its facts, can or should be extended to cover the situation here.

The Government urges, however, that in any event the McGillicuddy testimony as to Fox's statement was admissible in rebuttal under the circumstances of this case. It characterizes the statement as exculpatory rather than inculpatory and says that its sole effect was to impeach Fox's credibility on matters collateral to the Government's case in chief and not to challenge directly defendant's innocence. The Government contends that the statement was therefore admissible under the pre-*Miranda* decisions in Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954), and United States v. Curry, 358 F.2d 904, 907–913 (2d Cir.), cert. denied, 385 U.S. 873, 87 S.Ct. 147, 17 L.Ed.2d 100 (1966), rehearing denied, 387 U.S. 949, 87 S.Ct. 2079, 18 L.Ed.2d 1341 (1967), and that the authority of these cases has not been undercut by *Miranda*.

In *Walder,* a 1950 indictment against defendant for the purchase and possession of heroin had been dismissed on the ground that the heroin capsule had been obtained by a search and seizure illegal under the Fourth Amendment. Defendant was again indicted two years later for other quite separate illegal transactions in narcotics. He took the stand and testified that he had never possessed any narcotics. The Government was then permitted, over objection, to introduce evidence of defendant's earlier possession solely for purposes of impeachment.

In sustaining the trial court's ruling the Supreme Court said,

"It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such an extension of the *Weeks* doctrine would be a perversion of the Fourth Amendment.

---

2. This theme runs through the decision in *Miranda.* See, e. g., 384 U.S. at 457, 461–462, 465, 467–470, 478, 86 S.Ct. 1602.

See also Wheeler v. United States, 382 F.2d 998, 1001 (10th Cir. 1967).

" * * * Of course, the Constitution guarantees a defendant the fullest opportunity to meet the accusation against him. He must be free to deny all the elements of the case against him without thereby giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for its case in chief. Beyond that, however, there is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility." 347 U.S. at 65, 74 S.Ct. at 356.

The *Walder* holding was extended by this circuit in United States v. Curry, supra, to permit the use of statements illegally obtained from a defendant to impeach his credibility on collateral matters not bearing directly on the question of guilt or innocence or contradictory of his version of the facts constituting the crime charged.[3]

These were pre-*Miranda* cases. In *Miranda* the Supreme Court said in unequivocal language:

"The warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility of *any statement made by a defendant*. No distinction can be drawn between statements which are direct confessions and statements which amount to 'admissions' of part or all of an offense. The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination. Similarly, for precisely the same

reason, *no distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory.'* If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution. *In fact, statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication.* These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement." 384 U.S. at 477–478, 86 S.Ct. at 1629 (emphasis supplied).

Moreover, the Court went on to state that "unless and until such warnings and waiver are demonstrated by the prosecution at trial, *no evidence obtained as a result of interrogation can be used against him*" (id. at 479, 86 S.Ct. at 1630) (emphasis supplied).

■ These pronouncements by the Supreme Court may be technically dictum. But it is abundantly plain that the court intended to lay down a firm general rule with respect to the use of statements unconstitutionally obtained from a defendant in violation of *Miranda* standards. The rule prohibits the use of such statements whether inculpatory or exculpatory, whether bearing directly on guilt or on collateral matters only, and whether used on direct examination or for impeachment.

■ Thus, we conclude that insofar as *Curry* and similar pre-*Miranda* cases extended the *Walder* doctrine to permit the use of statements unconstitutionally obtained from a defendant for purposes

---

**3.** In other jurisdictions the *Walder* doctrine also was applied to statements illegally obtained from the defendant. See, e. g., Tate v. United States, 109 U.S.App.D.C. 13, 283 F.2d 377 (1960). The *Tate* decision was limited somewhat by later cases in the District of Columbia Circuit.

See, e. g., Inge v. United States, 123 U.S. App.D.C. 6, 356 F.2d 345 (D.C.Cir. 1965) ; Johnson v. United States, 120 U.S.App.D.C. 69, 344 F.2d 163 (1964). See generally, "The Impeachment Exception to the Exclusionary Rules," 34 U.Chi.L.Rev. 939 (1967).

of impeachment on collateral matters, they are no longer governing law.[4]

■ *Walder*, involving as it does, the use for impeachment purposes of tangible evidence obtained by illegal search and seizure in connection with a charge entirely different from that on trial, is plainly distinguishable from the case at bar on its facts. We express no view on the continued viability of *Walder* on its facts,[5] but we are clear that in the light of *Miranda* it is no longer controlling in cases like that at bar.[6]

■ Since adequate *Miranda* warnings were not given in the case at bar, the Fox statements were inadmissible whether or not they related solely to collateral or direct issues.

*Groshart v. United States*, 392 F.2d 172 (9th Cir. 1968), reached the same conclusion as we do here. In so doing it pointed out that "the distinctions between direct and collateral issues, between major and minor points, or between lawful and unlawful acts are essentially meaningless. We reject them because they are * * * 'virtually unworkable.'" 392 F.2d at 179 (citations omitted). The difficulties and complications of applying such distinctions are well pointed out in the excellent discussion in *Groshart*. See id., at 179–180. See also Wheeler v. United States, 382 F.2d 998 (10th Cir. 1967); Commonwealth v. Padgett, 428 Pa. 229, 237 A.2d 209 (1968); State v. Brewton, Or., 422 P.2d 581, cert. denied, 387 U.S. 943, 87 S.Ct. 2074, 18 L.Ed.2d 1328 (1967);

People v. Kulis, 18 N.Y.2d 318, 323–324, 274 N.Y.S.2d 873, 875–876, 221 N.E.2d 541, 542–543 (1966) (dissenting opinion of Keating, J.).

The case at bar is illustrative of these difficulties. For example, it would be hard to say that the issue as to whether Fox was present in Rocky Point where the goods apparently came into his possession is collateral rather than bearing directly on innocence or guilt. It is an event which is closely related to the issues which the Government tendered to prove the commission of the crimes charged— knowing possession of goods stolen from an interstate shipment and conspiring to receive and transporting stolen goods in interstate commerce. Moreover, the principal issue at trial was Fox's guilty knowledge, and the jury was charged in that connection that false exculpatory statements could be considered as evidence of guilty knowledge.

The difficulties and complications of the *Curry* formulation are eliminated by following the clear mandate laid down in *Miranda*. Thus the conviction of Fox must be reversed on the ground that the required *Miranda* warnings were not given and that the testimony by McGillicuddy as to his statements made in the absence of such warnings was inadmissible.

■ Reversal as to Fox also requires reversal as to Norber. The theory of the Government's case was that Fox and Norber were partners in the criminal conduct charged and the acts proved in furtherance of the partnership were principally

---

4. Quite a different question was presented in United States v. Armetta, 378 F.2d 658 (2d Cir. 1967) "where the defendant's testimony [put] in issue the very question of what he told the police." 378 F.2d at 662. In *Armetta* the court was necessarily faced with determining only whether the admission of the statement given to the police was "plain error" under Rule 52(b), F.R.Cr.P. But as Judge Waterman's concurring opinion in United States v. Vanterpool, supra, pointed out, it is difficult to see how the statement in *Armetta* could be ruled inadmissible even had timely objection been made "when the fact that there was an inter-

rogation is first injected into the trial by the defendant himself."

5. But see United States v. Birrell, 276 F. Supp. 798, 817 (S.D.N.Y.1967).

6. We do not deal at this juncture with the admissibility for impeachment purposes of statements not qualifying under *Miranda* where, as in *Walder*, a defendant at trial, "Of his own accord * * * [goes] * * * beyond a mere denial of complicity in the crimes of which he is charged and made the sweeping claim that he had never" engaged in criminal activity similar to that charged. 347 U.S. at 65, 74 S.Ct. at 356.

those of Fox. It would be difficult to say that any major discrediting of Fox who was the only defendant to take the stand did not spill over on Norber or that the jury would have found Norber guilty if they had exonerated Fox.

Finally, we are well aware that the new Crime Control Act became law on June 19, 1968. On a retrial, if Fox again takes the stand and the Government offers rebuttal testimony as to his post-arrest statements, issues may arise as to the applicability and constitutionality of 18 U.S.C. § 351 added by Title II of the Act, and as to the procedures to be followed thereunder.[7] It would be premature for us to attempt to deal with such issues now when it cannot be foreseen how the new trial will develop or, indeed, whether such isues will arise at all.

In view of the grounds upon which we have reversed, it is unnecessary to reach the other questions raised by the appellants, except to say, in the interest of avoiding error at the retrial, that we seriously doubt the correctness of the judge's excluding testimony by Fox as to conversations with Marcus as hearsay. See United States v. Costello, 352 F.2d 848, 853–854 (2d Cir. 1965), cert. granted on other grounds, 383 U.S. 942, 86 S.Ct. 1195, 16 L.Ed.2d 205 (1966), mooted by Costello's death, see Marchetti v. United States, 390 U.S. 39, 41 n. 1, 88 S. Ct. 697, 19 L.Ed.2d 889 (1968).

The judgments of conviction are reversed and a new trial ordered.

MOORE, Circuit Judge (dissenting):

I dissent.

If our opinion of some three months' standing that "the words of *Miranda* do not constitute a ritualistic formula which must be repeated without variation in order to be effective," and that "Words which convey the substance of the warn-ing along with the required information are sufficient" [1] is to have any application to subsequent decisions in this circuit on the point involved, this case calls for such application. There was nothing said in *Miranda* itself that there must be slavish adherence *in haec verba* to the formula suggested therein. The Supreme Court believed that "in-custody" questioning jeopardized the privilege against self-incrimination. The Court stated that "Procedural safeguards must be employed to protect the privilege, and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required." Then follows the formula which the majority holds, in effect, must be stated literally and without variation.

The majority, in holding that the words "he didn't have to make any statement" did not sufficiently warn of Fox's "right to remain silent," have to resort to the farfetched supposition that "statement" "could easily be interpreted to mean that Fox did not have to make a *formal* statement rather than that he need not answer any questions or say anything at all." (Emphasis mine.)

I cannot conceive that anyone, just having been arrested, when told that he did not have to make a statement would construe this warning as relieving him of an obligation to make a formal statement akin to a press release. Such a construction, in my opinion, is highly unrealistic. To give such talismanic significance to the words "the right to remain silent" is to preclude all other forms of expression which would convey the same idea. In *Miranda,* the Supreme Court clearly did not wish to prescribe such a strict formula. At page 484, 86 S.Ct. at page 1633, the Court cited a letter from the Solicitor General which was "consistent

7. It may be noted that under the new Act, after a trial judge determines that a statement was voluntarily made, he "shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all of the circumstances."

1. United States v. Vanterpool, 394 F.2d 697 (2 Cir. April 29, 1968).

with the procedure which we delineate today" in which the Solicitor General advised the Court that the FBI warned suspects that they had "a right to say nothing," citing as examples, Westover v. United States, 342 F.2d 684 (9 Cir. 1965), rev'd on other grounds, Miranda v. State of Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966), and, Jackson v. United States, 119 U.S.App. D.C. 100, 337 F.2d 136 (1964), cert. denied, 380 U.S. 935, 85 S.Ct. 944, 13 L.Ed. 2d 822 (1965). In both those cases the language used was that the suspect "did not have to make a statement."

The second deviation found by the majority from their conception of *Miranda* standards is that Fox was only told that "he could consult an attorney prior to any question," whereas he should have been told that he had "the right to the presence of an attorney." But if he had the right to consult an attorney "prior to *any* question" (emphasis added), the attorney could have prevented any interrogation without his being present—or any interrogation at all.

As a third deficiency, the majority point to the failure to offer the appointment of counsel on the assumption that Fox could not afford one. Of course, if Fox had even suggested indigency, he would have been entitled to counsel; but absent some expression of financial inability or any showing of actual harm based on indigence, his rights were not jeopardized. Admittedly, in *Miranda*, 384 U.S. at 473, n. 43, 86 S.Ct. 1602, the Supreme Court advised against *ex post facto* inquiries into actual harm premised on financial inability; the Court's rationale was that the expedient of giving a warning, as outlined in *Miranda*, was "too simple." Here, however, the interrogation occurred before both the Criminal Justice Act of 1964, 18 U.S.C.A. § 3006A and *Miranda*. The agents were not forewarned of what was later to be found a simple "expedient." Therefore, in these circumstances, inquiries into actual prejudice should be permissible. In this case, there is no proof of any harm premised on financial inability.

Moreover, Fox was apparently fully aware of his rights. Several minutes after the interview began, he stated that he would proceed no further without consulting an attorney.

In view of my belief that the *Miranda* warnings were adequate, I find it unnecessary to express my opinion as to the effect of the *Walder* or *Curry* decisions on cases involving similar facts or principles. However, if the true administration of justice is related in any way to the development of the truth under the particular circumstances presented to the courts in these two cases, I would endorse the portion of Judge Waterman's concurring opinion in Vanterpool, supra at 701. "The defendant by his own testimony voluntarily and intentionally relinquished his right to have what he said at that interrogation remain hidden from the jury and the trial judge."

