**UNITED STATES of America, Appellee,**

v.

**Paul CHAPLIN, Defendant-Appellant.**

**No. 696, Docket 32851.**

United States Court of Appeals, Second Circuit.

Argued April 8, 1970.

Decided Dec. 3, 1970.

Thomas J. Fitzpatrick, Ross Sandler, Asst. U. S. Attys., Whitney North Seymour, U. S. Atty., for appellee.

Samuel W. Gilman, New York City, for appellant.

Before WATERMAN and FRIENDLY, Circuit Judges, and ZAMPANO, District Judge.*

* Of the District of Connecticut, sitting by designation.

WATERMAN, Circuit Judge:

Appellant was charged in a one count indictment with having violated 21 U.S. C. §§ 173 and 174 by having in his possession 39 grams of heroin. He was convicted after a jury trial in which the judge gave a supplemental "Allen charge."

According to the Government's proof, two Federal narcotics agents, after having had Chaplin under surveillance for some time, stationed themselves in an apartment adjacent to his, and, through a common wall of both apartments, listened, without the aid of electronic eavesdropping devices, to conversations between him and his girl friend. Having heard some discussion relative to illicit drugs, the agents waited until Chaplin and his friend left the apartment and then, before the Chaplin apartment door had been closed, placed them under arrest. After one of the agents had informed Chaplin that he was under arrest, the agent immediately seized a brown paper bag which Chaplin was openly carrying. Inside the bag the agents discovered 444 glassine envelopes of heroin and miscellaneous cutting and adulterating paraphernalia. Also, one of the arresting officers testified that at the time of the arrests and after Chaplin had been warned of his rights, Chaplin said: "What can I say? You caught me. You caught me with the goods." In addition, the agents searched Chaplin's apartment and there found two empty quinine bottles, two boxes of empty glassine bags, and five measuring spoons. The constitutionality of this apartment search is not challenged upon appeal. On the morning following the arrest Chaplin was interviewed by an Assistant United States Attorney in the prosecutor's office and at that time admitted that he had possessed one ounce of heroin when arrested and that he had been selling narcotics for a month.

Chaplin, however, testifying in his own behalf, tended to demonstrate that he had been "framed" by the narcotics agents. He insisted that he had never seen or possessed the narcotics in question before trial and that, although he had given the statement to the Assistant U. S. Attorney the day after his arrest, it had been an untruth and he had said it because the agents had threatened to report him as a narcotics violator to his New York parole board if he did not confess and did not also cooperate with them in locating some "pushers" uptown. Although the Government denied any knowledge that Chaplin had been on parole, Chaplin testified that he was indeed a New York State parolee, having been paroled after he had been incarcerated but seven years of a 10 to 20 year sentence imposed after a manslaughter conviction. Appellant also testified that during the search of his apartment the agents seized, and kept, three mink fur pieces and $1800 in cash. Later, according to Chaplin, the agents gave $800 of the $1800 to his girl friend so that she could bail Chaplin out of jail. The agents, however, denied any knowledge of either the furs or the money.

Appellant advances two claims of prejudicial error at his trial. He first maintains that his statement confessing guilt was improperly admitted into evidence. He next argues that the trial judge erred in a supplemental charge delivered to the jury after the jurors had deliberated some five hours and had reported that they were unable to reach a unanimous verdict.

The trial judge held a hearing out of the presence of the jury on the motion to suppress Chaplin's statement of guilt. As we have said above, Chaplin represented that the statement he gave was untrue and was made because the agents had threatened that, if he failed to cooperate with them, he would be turned over to New York parole authorities to serve the 13 years of imprisonment remaining on his manslaughter sentence. The agents denied that they had made the threats. The court believed the agents and declined to hold that the statement made by Chaplin was in any way coerced by the officers.

The statement in question was given to the prosecutor in that officer's office at 11:30 in the morning, approximately eleven hours after Chaplin's arrest. Chaplin did not claim that this attorney had threatened him in any way. The statement was made in the presence of one of the arresting officers, another agent, and a stenographer, and was preceded by warnings to Chaplin that he had the right to remain silent and he had the right to have a lawyer present. However, the right to have counsel appointed to represent him if he were indigent was not mentioned. This interview, which consumed no more than ten minutes, occurred three months before the Supreme Court handed down the landmark decision in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694 (1966), but, as trial did not commence until 1968, Chaplin's statement was not admissible against him at trial if the failure to advise him of an indigent's right to assigned counsel had controlling significance here. Johnson v. New Jersey, 384 U.S. 719, 734, 86 S. Ct. 1772, 16 L.Ed.2d 882 (1966).

▪ The Government contends that its failure to inform Chaplin of an indigent's right to assigned counsel was not prejudicially relevant because Chaplin knew of this right inasmuch as he had availed himself of it on at least two previous occasions, and, moreover, because he was not indigent. However, as stated in Miranda, supra 384 U.S. at 473 n. 43, 86 S.Ct. at 1627:

> While a warning that the indigent may have counsel appointed need not be given to the person who is known

to have an attorney or is known to have ample funds to secure one, the expedient of giving a warning is too simple and the rights involved too important to engage in ex post facto inquiries into financial ability when there is any doubt at all on that score.

We agree with the soundness of this advice, and if Chaplin's statement had been taken after Miranda had been decided, we would hold the Government to its duty to have warned Chaplin of his possible right to assigned counsel for, to say the least about Chaplin's financial ability at the time he made his statement to the prosecutor, there could well have been doubts about whether Chaplin was indigent. However, the rationale of the Court's advice is that, when the Government realizes that a defendant, if indigent, must be told of his right to have assigned counsel, the expedient of telling this to defendants when indigency is questionable is too simple an expedient not to be adopted where there is any doubt at all on that score. Inasmuch as the agents questioning Chaplin were not forewarned of this simple expedient, we decide here that, where Miranda is applied to pre-Miranda statements, this court will make an ex post facto inquiry into financial ability to determine whether a defendant, who has not been fully warned of an indigent's right to assigned counsel, has suffered prejudice.[1]

▪ By his own testimony, Chaplin was not indigent. He was steadily employed at wages varying from $60 to $100 per week; he supported no one but himself; his girl friend, with whom he was arrested, owned a 1964 Cadillac at

---

1. While we recognize that this court was presented with an almost identical issue in United States v. Fox, 403 F.2d 97 (2 Cir. 1968), and reached the opposite conclusion, we do not consider Fox dispositive. In Fox the Miranda decision was applied to pre-Miranda statements submitted at a post-Miranda trial. One of the inadequacies in the Miranda warnings was the failure to inform the defendant of an indigent's right to assigned counsel; the Government did not claim that Fox was not indigent, but Judge

Moore's dissent indicates that Fox made no claim of indigency as Chaplin has claimed here, and that under the rule we adopt today Fox may not have been prejudiced by the Government's failure on this point. However, two other inadequacies were found in the warnings given to Fox. Despite this court's later refutation of one of these inadequacies when it is standing alone, United States v. Lamia, 429 F.2d 373, 377 (2 Cir. 1970), Fox may be said to be correct when applied to a situation involving multiple inadequacies.

the time of the 1966 arrest and shortly thereafter purchased a 1967 Cadillac with money in part given her by Chaplin. Out of his own mouth, he claimed that he was sufficiently in funds to have had the $1800 in cash which the agents allegedly took, and his credit was good enough for him to be entrusted with three mink stoles on an approval basis for the purpose of deciding which one of the three to buy. Finally, he had sufficient funds to retain trial counsel. While, especially in the light of inflationary trends and differential cost-of-living indices, we do not intend to set forth monetary guidelines for resolving the question of prejudice in these cases, we conclude that Chaplin was not prejudiced by the agents' failure to warn him of an indigent's right to assigned counsel. Under these circumstances Chaplin's pre-

*Miranda* statement was properly admitted at trial.

■ Chaplin also claims that the trial judge committed prejudicial error in a supplementary Allen charge[2] given to the jury after a reported impasse in their deliberations. However, no objection to the charge was made by defense counsel at the trial, and the issue is not properly before us unless the alleged defects constitute plain error. Rules 30, 52(b), Fed.R.Crim.P.; Singer v. United States, 380 U.S. 24, 38, 85 S.Ct. 783, 13 L.Ed. 2d 630 (1965). While we agree that the cancer analogy and the references to accusations of crooked government agents were unfortunate, we do not find them to be plain error, compare United States v. Bowles, 428 F.2d 592, 595 (2 Cir. 1970), and if, in actuality, there had been

2. The supplemental charge follows:

Members of the jury, the trial of the lawsuit is very much like an operation of a doctor who goes in to make some exploration to find out about some pain in a person's abdomen or stomach. He opens up the area and he can find a benign growth or he can find a cancerous growth. He, of course, does not like to find a cancer any more than any other surgeon would, but, of course, the surgeon is obligated to do a certain job and if he finds it, he must report it and he must do the best he can.

This is not a pleasant task that you have, for either side. There is no question that this is important to both the government and to the government's witnesses in this case because they have been categorized as crooks, and it is, of course, an important case for this defendant.

This is a function which the society sets up, an organization such as this, and requires the jury to perform.

I suggest to you that you deliberate further in this case and that you make a judgment, because I do not think that since there is a question of fact involved here, it should not be impossible of resolving if you discuss it properly. Of course, I do not ask any of you to give up any judgment that you feel that you have in the case, but I do suggest to you that you explore further the details of the case, the implications of the case, the testimony in the case and the law as given to you by the Court, and I suggest

to you very strongly that I think it is possible to arrive at a verdict.

Now, it is not going to be a verdict that everybody is going to like. It is just too bad. It is a verdict, however, which must be based upon the evidence in the case and the law. This is actually the third day of the case and you have been out maybe four, five hours. I feel that this warrants further discussion on your part, to see if you can come to an agreeable verdict one way or the other.

You are, therefore, directed to further deliberate.

While the Tenth Circuit has suggested that the Allen charge, if used at all, be used only as part of the main charge, United States v. Wynn, 415 F.2d 135 (10 Cir. 1969), this court has recently reiterated its approval of supplementary Allen charges in United States v. Hynes, 424 F.2d 754 (2 Cir. 1970). And although the Third Circuit has prospectively ruled that Allen charges instructing the minority faction of the jury to reconsider its view in light of the majority stance may no longer be used in that circuit, United States v. Fioravanti, 412 F.2d 407, 414–420 (3 Cir.), cert. denied sub nom. Panaccione v. United States, 396 U.S. 837, 90 S.Ct. 97, 24 L.Ed.2d 88 (1969), *Hynes* does not disapprove such instructions. In any event, the charge in this case makes no reference to majority and minority factions in the jury.

any pro-prosecution flavor to the charge, it could have been corrected upon proper and timely objection.

The judgment of conviction is affirmed.