UNITED STATES of America, Appellee,

v.

Vladimir DIZDAR, Jozo Brekalo and
Marijan Buconjic,
Defendants-Appellants.

Nos. 791, 947 and 948, Dockets 78–1007,
78–1020 and 78–1021.

United States Court of Appeals,
Second Circuit.

Argued March 31, 1978.

Decided July 27, 1978.

James M. LaRossa, New York City (John W. Mitchell, New York City, of counsel), for defendant-appellant Vladimir Dizdar.

James St. Clair, Boston, Mass. (Hale & Dorr, Robert D. Keefe, Boston, Mass., of counsel), for defendants-appellants Buconjic and Brekalo.

Raymond A. Levites, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, Howard W. Goldstein and Audrey Strauss, Asst. U. S. Attys., New York City, of counsel), for appellee.

Before FEINBERG, MANSFIELD, and OAKES, Circuit Judges.

MANSFIELD, Circuit Judge:

Following an increase in acts of violence in various countries against foreign diplomats and representatives, Congress in 1972 passed legislation extending the protection of our federal criminal laws to designated categories of foreign officials, 18 U.S.C. §§ 1201, 1116(b), S.Rep. No. 92–1105, 92nd Cong.2nd Sess. (1972), reprinted in [1972] U.S.Code Cong. & Admin.News, p. 4316. The present appeal raises issues with respect to the application of those laws to acts committed in June 1977 by appellants Dizdar, Brekalo, and Buconjic on the premises of the Yugoslavian Mission to the United Nations (the "Mission") in New York City.

After a fourteen-day trial in the Southern District of New York before Judge Thomas P. Griesa and a jury, appellants were convicted of conspiracy to seize and confine a foreign official, 18 U.S.C. § 1201(c). In addition, Dizdar was convicted of assaulting a foreign official with a deadly or dangerous weapon, 18 U.S.C. § 112, and Buconjic was convicted of assaulting a foreign official. Finding no reversible error, we affirm.

On June 14, 1977, at approximately 2:20 p. m., appellants, advocates of Croatian independence, forcibly entered the Mission premises, shooting and wounding seriously one member of the Mission staff in the process. All three men carried loaded re-

volvers into the Mission, along with a large quantity of ammunition, a supply of leaflets entitled *Freedom for Croatia,* a set of walkie-talkies, a portable radio, twenty-two packages of cigarettes, and three coils of rope. The staff of the Mission, exclusive of family members, consisted of twelve diplomatic officials and twenty-nine employees, all but one of whom were foreign nationals.

Once they gained entry to the Mission, appellants barricaded themselves in a room, kept the police at bay by pretending that they were holding a woman hostage, and made several "demands," including (1) that they receive immediate media coverage, (2) that their leaflet be transmitted to Kurt Waldheim, Secretary General of the United Nations, and (3) that a photograph be taken of the Croatian and American flags which the men had hung from a window in the Mission.

When these demands were substantially met, appellants surrendered to New York City police. They were interrogated, and all three made statements in which they admitted that they had planned to seize staff employees of the Mission and hold them as hostages. Buconjic added that he planned to use the rope to tie up prisoners. All three defendants testified at trial, repudiating their confessions insofar as they indicated that the men had intended to take hostages.

## DISCUSSION

Appellants raise numerous claims of error. Perhaps the most serious is their contention that the district court erred in denying their motion for a directed verdict of acquittal on the ground that the Government had failed to prove that they had violated 18 U.S.C. § 1201, which prohibits the seizure, confinement, or abduction of a "foreign official".[1] In pertinent part, 18 U.S.C. § 1116(b)(3)(B) defines a "foreign official" as

> "(B) any person of a foreign nationality who is duly notified to the United States as an officer or employee of a foreign government or international organization, and who is in the United States on official business, and any member of his family whose presence in the United States is in connection with the presence of such officer or employee."

▆ Thus, the burden was upon the Government to prove that those whom the defendants had conspired to seize and to detain as hostages were "persons of a foreign nationality who [had been] duly notified to the United States" as officers or employees of their government. This the Government sought to do by introducing the testimony of Sol Kuttner, a State Department adviser attached to the United States Mission to the United Nations, who is responsible for insuring "that the obligations that have been entered into by the United States in the way of treaties and agreements with missions to the United Nations and the United Nations Secretariat are observed." He testified that he was responsible for overseeing the procedure for the notification to the United States of foreign officials connected with the United Nations as described in 18 U.S.C. § 1116(b). He outlined the procedure as follows:

> "When a member mission to the United Nations arrives, his mission has the obligation of submitting his name on an appointments paper to the Secretary General of the United Nations.
>
> The Secretary General has his chief of protocol submit the name on a list which is issued once every two weeks to the United States Mission to the United Na-

---

1. 18 U.S.C. § 1201(a), (c) provides:
   "(a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, . . . when:
   \* \* \* \* \* \*
   (4) the person is a foreign official . . . as . . . defined in section 1116(b) of

this title, shall be punished by imprisonment for any term of years or for life.
   \* \* \* \* \* \*
   (c) If two or more persons conspire to violate this section and one or more of such persons do any overt act to effect the object of the conspiracy, each shall be punished by imprisonment for any term of years or for life."

tions. We in turn submit that list to the Department of State in Washington, and that serves as the notification that is required . . . "

Kuttner testified that on June 14, 1977, when appellants seized the Mission, at least 12 officers and 29 staff members of the Yugoslavian Mission had been "duly notified" to the United States as foreign officials, including the Yugoslavian Ambassador to the United Nations, Jaksa Petric, and the staff member who had been wounded, Radomir Medic.[2] Documentary evidence to support the testimony was also introduced.

Appellants contend that this evidence was not sufficient to permit the offense charged under 18 U.S.C. § 1201(c) to go to the jury, because it failed to show that all of the procedures necessary for the notification of foreign officials to the United States had been followed. Citing 22 C.F.R. § 2.3 (1975) and Article V, § 15 of the Headquarters Agreement between the United States and the United Nations, 22 U.S.C. § 287, appellants argue that Kuttner's description of the notification procedure was incorrect, and that the procedure is actually bilateral, requiring acceptance or approval by the United States or any foreign official who seeks to be "duly notified." We disagree.

22 C.F.R. § 2.3 (1975) states:

(a) Any notification of a foreign official for purposes of section 1116(b)(2) of title 18 of the United States Code shall be directed by the foreign government or international organization concerned to the Chief of Protocol, Department of State, Washington, D.C. 20520. For persons normally accredited to the United States in diplomatic or consular capacities and also for persons normally accredited to the United Nations and other international organizations and in turn notified to the Department of State, the procedure for placing a person in the statutory category of being 'duly notified to the United States' shall be the current procedure for accreditation, with notification

in turn when applicable. The Chief of the Office of Protocol will place on the roster of persons 'duly notified to the United States' the names of all persons currently accredited and, when applicable, notified in turn, and will maintain the roster as part of the official files of the Department of State adding to and deleting therefrom as changes in accreditations occur.

The regulation equates the notification procedure with "the current procedure for accreditation." That procedure was described by the United States delegation to the Vienna Nations Conference on Diplomatic Intercourse and Immunities:

All that should be necessary in the case of a member of the staff of the mission is his notification by the sending State to the two receiving States [where assignment to two States] and their express or tacit acceptance of him. A person can be 'accredited' in many ways. A note from the head of mission regarding a newly arrived member of his staff should be quite sufficient to assure the receiving State that he does in fact speak for his government. Unless the receiving State objects to the appointment, he will thereby have been 'accredited,' in the dictionary meaning of the term.

7 Whitman, *Digest of International Law* 77 (1970).

■ The description of the notification procedure contained in 22 C.F.R. § 2.3 is, therefore, fully consistent with Kuttner's testimony. Although subparagraph (a) of 22 C.F.R. § 2.3 requires the Chief of Protocol of the State Department to maintain a roster of the names of persons who have been duly notified to the United States, the maintenance of such a roster is not a condition precedent to effective notification of a foreign official to the United States. Moreover, although the fact of notification might also be established through introduction of the roster through the Chief of Protocol, the Chief was not the only witness

---

2. It was revealed during cross-examination of Kuttner that one staff employee of the Yugoslavian Mission was a United States citizen, and

therefore, by definition, not a foreign official under 18 U.S.C. § 1116(b).

qualified to testify concerning the notification procedure, as appellants suggest. Nor was introduction of the actual roster the only way in which the Government could prove that the Yugoslavian Mission staff included "foreign officials" within the meaning of 18 U.S.C. § 1116(b).

■ Appellants' invocation of the Headquarters Agreement, 22 U.S.C. § 287, is similarly unavailing. As Judge Weinfeld's opinion in *United States ex rel. Casanova v. Fitzpatrick,* 214 F.Supp. 425 (S.D.N.Y.1963), makes clear, the section of the Agreement upon which appellants rely relates only to the procedure for conferring full diplomatic immunity upon foreign officials, as distinguished from the less formal procedure for notifying the United States that a member of an Embassy or Mission staff is an officer or employee of a foreign government in this country on official business. *See United States v. Fitzpatrick, supra,* 214 F.Supp. at 431–34 [1963]; *U.S.Code Cong. & Admin. News,* 1972, pp. 4316–4330.

Kuttner's testimony accurately described the notification procedure under 18 U.S.C. § 1116(b), and he was fully qualified to testify regarding that subject. Fed.R.Evid. 602; 702. His testimony provided a sufficient evidentiary basis for the district court to submit to the jury the issue of whether the intended victims of the alleged conspiracy were "duly notified" to the United States as "foreign officials" within the meaning of the statute. *United States v. Taylor,* 464 F.2d 240, 243 (2d Cir. 1972). Judge Griesa therefore did not err in denying the motion for a directed verdict of acquittal.

■ Appellants' next claim also relates to the "foreign official" status of the purported victims of the alleged conspiracy. The contention is that for the conspiracy count to have been submitted to the jury, the Government was required to prove either that all of the potential victims were "foreign officials,"[3] or that the defendants had the specific intention of seizing "for-

eign officials" as they are defined in the statute.

The only authority appellants cite for this proposition is *United States v. Feola,* 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975). That decision, however, does not support their position. The Supreme Court held in *Feola* that persons could be found guilty of conspiracy to assault a federal officer in violation of 18 U.S.C. § 111 even though they were unaware of their victim's status as such an officer, and that proof of a general *mens rea* was sufficient, 420 U.S. at 692, 95 S.Ct. 1255. The issue was not the defendants' knowledge of their victims' identity, but whether the defendants' "agreement, standing alone, constituted a sufficient threat to the safety" of the persons protected by the statute to give rise to the jurisdiction it confers. 420 U.S. 695, 95 S.Ct. 1255. The statutes in question in the present case, 18 U.S.C. §§ 1116(b) and 1201(c), were enacted in the aftermath of the terrorist attack on the Israeli Olympic Team at the 1972 Olympic Games in Munich for the purpose of extending the protection of federal criminal law to "resident diplomats, consular and other foreign government personnel and their families . . ." S.Rep. No. 92–1105, 92nd Cong.2d Sess. (1972), reprinted in [1972] U.S.Code Cong. & Admin.News, p. 4316. Appellants' agreement to seize the Yugoslavian Mission and its staff was exactly the kind of threat to the safety of protected foreign officials that warrants the invocation of these laws, 18 U.S.C. §§ 1116(b) and 1201(c).

In any event, when the evidence in this case is viewed most favorably to the Government, as it must be, *United States v. Gerry,* 515 F.2d 130, 134 (2d Cir. 1975), it shows that appellants conspired to mount an armed seizure of a foreign Mission, and forcefully to detain the occupants as hostages. It could reasonably be inferred by appellants, who were directing their actions against the Yugoslav Government, that the Yugoslav Mission would be staffed by ac-

---

**3.** It would have been impossible for the Government to prove that all of the potential victims of the conspiracy were foreign officials, since one of the 41-person Yugoslav Mission staff was an American citizen, see note 2, *supra.*

credited Yugoslav representatives. As it turned out, all but one member of the forty-one person staff of the Mission were protected "foreign officials." Under the circumstances, we are satisfied that the intended victims of the conspiracy were, as *Feola* requires, "identified with sufficient specificity so as to give rise to the conclusion that had the [seizure of hostages] been carried out the victim[s] would have been [protected foreign officials]." 420 U.S. 695–96, 95 S.Ct. 1269.

█ Appellants next claim that their motion for a directed verdict should have been granted because the Government failed to introduce sufficient evidence of the alleged conspiracy, independent of appellants' post-arrest statements, to support the convictions. Although a defendant cannot be convicted on his own uncorroborated confession, *Smith v. United States*, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192 (1954), there was ample independent evidence of appellants' conspiracy to seize the Yugoslavian Mission and to detain hostages. The proof included preliminary long-distance telephone calls between appellants, trips by Dizdar and Brekalo from Chicago and St. Louis to New York, their meeting with Buconjic in his home in New Windsor, New York, the acquisition of the firearms, rope, walkie-talkies, chain and other items, as well as their joint action in forcing their way into the Mission. *Hamling v. United States*, 418 U.S. 87, 124, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974) ("The existence of an agreement may be shown by circumstances indicating that criminal defendants acted in concert to achieve a common goal."), *quoted with approval in United States v. Green*, 523 F.2d 229, 233, n. 5 (2d Cir. 1975).

Aside from appellants' incriminating statements, their agreement to seize foreign officials in the Mission was corroborated by their possession of the tell-tale coils of rope, from which an intent to bind hostages might be inferred, as well as from the fact that they actually pretended to have a hostage when the police arrived at the Mission. Furthermore, appellants questioned Medic momentarily after wounding him to determine the whereabouts of other members of the Mission staff, and actually tried to get the injured man to his feet in order to take him into custody.

In short, there was sufficient independent corroboratory evidence of conspiracy, when considered along with appellants' post-arrest statements, to permit reasonable jurors to conclude beyond a reasonable doubt that the defendants were guilty of conspiring to seize the Mission and hostages. *United States v. Taylor*, 464 F.2d 240 (2d Cir. 1972). The jury was not required to credit appellants' testimony, which attempted to explain away the incriminating proof.

█ Appellants also challenge the trial judge's following instructions concerning the jury's evaluation of circumstantial evidence:

> Earlier in my charge I mentioned circumstantial evidence. At this point I think it might help to describe the two basic types of evidence, direct evidence and circumstantial evidence. If a party in court is trying to prove an event and an eye-witness testifies that he saw the event happen, that is direct evidence and, of course, there are many other types of direct evidence that I could mention. But one clear example is the eye-witness testimony of a particular event.
>
> Circumstantial evidence, on the other hand, is where one fact or a chain of facts gives rise to a reasonable inference of another fact. If one fact or group of facts on the basis of commonsense and common experience leads you logically and reasonably to infer other facts, then this is circumstantial evidence. Circumstantial evidence is no less valid and no less weighty than direct evidence provided that the inferences drawn are logical and reasonable. In a criminal case where a defendant's state of mind is at issue, where there are questions of what the defendant intended or what his purpose was, circumstantial evidence is often an important means of proving what the state of mind was at the time of the events in question. Sometimes it is the only means of proving state of mind.

Let me give you a simple illustration, which has nothing to do with this case. If you saw three men go into a ranch corral in the middle of the night with ropes you could reasonably infer that the men planned and intended to steal some horses from the corral. You could draw this inference though you never heard them say a word about what their intention was. In the case of a trial the men might take the stand and deny that they had an intention to steal horses. They might explain other circumstances about their presence at the corral. But the point I want to make is that the jury would then have to weigh the circumstantial evidence about the events and the scene and the actions.

They would have to weigh that evidence and of course the jury would also have to weigh the testimony by the men and they would have to arrive at what they considered was proven or not proven.

Defense counsel objected to the use of this illustration, contending that its close parallel to the facts of the case would have a prejudicial influence on the jury. Although we think the trial judge would have been better advised to use some other example, in view of the evidence that the defendants had brought coils of rope into the Mission in this case, the charge was not sufficiently prejudicial to require reversal. The content of the charge, standing alone, was not erroneous; in the main, it conformed to the standard jury instruction on circumstantial evidence. *See, e. g.,* 1 Devitt & Blackmar, *Fed. Jury Practices and Instructions,* 1502, 3d ed. (1977). Judge Griesa told the jurors that the example "has nothing to do with this case," and that it "was not intended and cannot be taken by you in any way to suggest any particular direction to be given to the evidence in the case." Moreover, in response to the objection, he gave an extensive supplemental instruction curing whatever prejudice might have been created by the illustration.[4]

■ Similarly, we find no merit in either of appellants' claims that the district court erred in denying Buconjic's motion to suppress his confession and defendants' mo-

4. In response to defense counsel's objection to his charge regarding circumstantial evidence, Judge Griesa gave the following supplemental clarifying instruction to the jury:

The Court: I have only one comment to make to you, ladies and gentlemen: I want to be supercautious and make sure that there was no misunderstanding created by me in the example I gave you about the circumstantial evidence. You recall that example. I repeat that all I intended to do or could reasonably do by giving you a hypothetical illustration about circumstantial evidence is to simply indicate to you in a rough way the type of reasoning process that might be gone through. But obviously in any hypothetical illustration you simply give the bare bones. In actual fact, whether you are dealing with such a situation or in dealing with the present case why you must consider all the circumstances and see whether the circumstances, taking into consideration everything known to you, everything in the evidence, to see whether from all those circumstances an inference can logically and reasonably be drawn towards a particular fact?

Putting it another way, what, if any, are the logical and reasonable inferences that can be drawn from a set of circumstances. Sometimes none can. Sometimes it is even-

stephen, one way or the other, and you just can't draw any particular inferences one way or the other. Sometimes the inferences tend to go in a particular direction quite logically and reasonably and if it does go in that direction, then that is what the jury is entitled to consider.

Finally, I want to make it clear, and I think the jury is mature enough to realize this, that I was trying to give you—there are many illustrations of circumstantial evidence that are used in court and you can think of almost an infinite number. One familiar illustration to people is that if they look out the window and see a street full of umbrellas, they can draw the inference that it is raining. Well, you can go on and on with a lot of illustrations and I never think they are terribly helpful because it isn't exactly the kind of issues that face you in this case.

But, in any event, my illustration was not intended and cannot be taken by you in any way to suggest any particular direction to be given to the evidence in this case. In considering this case your reasoning process will deal with the evidence in this case and you will determine what inferences should be drawn or not be drawn from the evidence in this case.

tions for a severance. The only challenge to the admissibility of Buconjic's confession is the contention that the *Miranda* warnings given to him failed to advise him adequately of his right to have a lawyer present during the interrogation.

The assistant district attorney who questioned Buconjic told him that he was "entitled to have a lawyer present," and that if he "[could] not afford a lawyer we'll get you a lawyer for free." After Buconjic indicated that he understood what he had been told, the prosecutor asked him, "Are you willing to tell me what happened without a lawyer present?" Buconjic answered affirmatively, and then confessed.

The record shows that the warnings adequately informed Buconjic of his right to counsel during the interrogation. The decisions relied upon by him are clearly distinguishable on their facts. *See, e. g., United States v. Fox,* 403 F.2d 97 (2d Cir. 1968) (defendant not told he could have attorney present). Although it is also claimed that his lack of fluency in English kept him from fully understanding his rights, we defer to the trial judge's determination of Buconjic's comprehension of the English language. We note, moreover, that Buconjic had been in the United States for nine years prior to the interrogation, and that he apparently testified in English throughout the proceedings below. *See generally United States v. Fox, supra; United States v. Lamia,* 429 F.2d 373 (2d Cir. 1970).

■ The basis of the claim that the district court erred in denying the defendants' motions for a severance is that they were unfairly prejudiced by the admission into evidence of each other's confessions. Although Judge Griesa repeatedly instructed the jury that each defendant's statement could be considered as evidence against only its author, appellants contend that they were nonetheless prejudiced. *See Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

In *Bruton* the Supreme Court held that as a general rule the confession of a non-testifying defendant, which implicates a co-defendant, may not be introduced at their joint trial, even though it is offered only against the declarant.[5] However, we have held that this rule does not preclude the admission of "interlocking" confessions of joint defendants. *See United States ex rel. Stanbridge v. Zelker,* 514 F.2d 45 (2d Cir. 1975). The rationale for this exception is that the prejudicial consequences that arise from the *Bruton* context do not occur when substantially identical inculpatory statements of co-defendants are admitted into evidence. We have held that such confessions need not be absolutely identical, *United States ex rel. Ortiz v. Fritz,* 476 F.2d 37 (2d Cir. 1973), but only that they must be "substantially the same and consistent on the major elements of the crime involved." *United States ex rel. Duff v. Zelker,* 452 F.2d 1009 (2d Cir. 1971).

Appellants contend that the three confessions introduced at their trial were not substantially the same, asserting that Buconjic's statement made no references to hostages, while the other statements did. However, the transcript of Buconjic's statement to the assistant district attorney who questioned him reveals that Buconjic admitted intending to take hostages. In addition, Detective Finnegan, who was present during Buconjic's interrogation, testified at the suppression hearing that the defendant stated that he intended "to take hostages" at the Mission. Viewed as a whole the statements by the three appellants are sufficiently consistent with respect to material facts to interlock. Indeed, we have upheld the admission of confessions as interlocking that are arguably less consistent with each other than the ones introduced in this case. *See United States ex rel. Ortiz v. Fritz, supra,* 476 F.2d 37; *United States ex rel. Duff v. Zelker, supra,* 452 F.2d 1009. The district court therefore did not err in denying the motions for separate trials.

We have carefully examined appellants' other claims of error and find them to be devoid of merit.

The convictions are affirmed.

---

**5.** All three defendants testified at trial.