UNITED STATES of America,
Appellee,

v.

Robert Anthony LAMIA, Appellant.

No. 537, Docket 34002.

United States Court of Appeals,
Second Circuit.

Argued Feb. 11, 1970.

Decided June 25. 1970.
Certiorari Denied Nov. 9, 1970.
See 91 S.Ct. 150.

**374**

Jerome C. Ditore, Asst. U. S. Atty. (Edward R. Neaher, U. S. Atty. for Eastern District of New York, on the brief), for appellee.

Robert J. Haft, New York City (Gary Schwager, New York City, on the brief), for appellant.

Before LUMBARD, Chief Judge, and FRIENDLY and FEINBERG, Circuit Judges.

LUMBARD, Chief Judge:

Robert Anthony Lamia appeals from his conviction after a jury trial in the Eastern District on a two count indictment charging armed robbery of $8,100 from the Jamaica Savings Bank on April 7, 1967, in violation of 18 U.S.C. §§ 2, 2113(a) and 2113(d). Appellant was sentenced to a ten year term on the second count, the first count having been dismissed. The main issue on this appeal is whether the trial court properly admitted Lamia's confession which he urges was made before adequate warnings had been given pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We affirm the conviction, finding that Lamia had been adequately warned of his rights under *Miranda* before any questioning had begun and that he had knowingly waived his rights.

Immediately after the robbery of the Sunnyside Federal Savings and Loan Association on August 3, 1967, FBI Agent Myers began his investigation. Accompanied by two New York City detectives, Myers went in search of Lamia and found him at the bar of the Junction Inn in Queens County at 8:40 P.M. They recognized Lamia at the bar because they had "a good description of an individual who was supposed to have robbed the bank earlier that date" and also because they had "obtained a photograph from the brother-in-law of the defendant." After identifying themselves, the agents asked appellant his name, and when he said he was Robert Lamia they placed him under arrest and handcuffed him. At this time he was advised by one of the city detectives, Detective Mergner, of his right to remain silent and that anything he did say would be used against him at a later date. Lamia was then taken outside the bar and Agent Myers again identified himself and advised Lamia that

"he need not make any statement to us at that time, that any statement he would make could be used against him in court; he had a right to an attorney, if he wasn't able to afford an

attorney, an attorney would be appointed by the court."

Myers then asked Lamia where the money from the Sunnyside Savings and Loan could be found, and Lamia stated it was in his apartment. Lamia inquired whether his partner, Montaneri, had been caught, and without responding, Agent Myers asked him where his clothing was. Lamia replied that it was in his apartment. Myers then inquired if Lamia had ever been involved in any other bank robberies with Montaneri. Lamia replied that he and Montaneri had robbed the Jamaica Savings Bank in April, 1967, and it is for this earlier robbery that Lamia was convicted.

Lamia was taken to the 108th Precinct Station House and questioned further by FBI Agents Rommel and Matson. The agents informed him once again of his rights, this time reading from the FBI form.[1] Lamia said he understood the form and signed the waiver of rights. He then proceeded to give two statements, one relating to each robbery, which were put into writing and signed.[2]

The oral confession given outside the bar and the later written confession were both admitted into evidence. Lamia was also identified in court by Mr. Temple, the Branch Manager of the Elmhurst Branch of the Jamaica Savings Bank, as one of the two bank robbers. Temple testified that both robbers had guns and that although his attention was focused on the gunman immediately before him, he saw Lamia by the door. He also noticed a customer entering the bank, who, after seeing the robbers and the guns, attempted to leave. Lamia grabbed the customer and pulled him back into the bank saying "You come in here." Lamia did not testify at the trial but did testify at the suppression hearing.

■■ We find that the warnings given to Lamia adequately met the standards set in *Miranda, supra*. As we stated in United States v. Vanterpool, 394 F.2d 697, 698–99 (2d Cir. 1968), "[T]he words of *Miranda* do not constitute a ritualistic formula which must be repeated without variation in order to be effective. Words which convey the substance of the warning along with the required information are sufficient." The Supreme Court did not prescribe an exact format to be used in advising a suspect of his

1. The FBI form which Lamia signed was as follows:
   YOUR RIGHTS
   Before we ask you any questions, you must understand your rights.
   You have the right to remain silent.
   Anything you say can be used against you in court.
   You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.
   If you cannot afford a lawyer, one will be appointed for you if you wish.
   If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.
   WAIVER OF RIGHTS
   I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

2. The statement signed by Lamia discussing the Jamaica robbery is set out below:
   "A couple of months ago on a rainy day Ross Montanari who I also know as John ["and myself" is inserted here and initialed by Lamia] robbed a bank which is located on Queens Boulevard across the street from Macy's Department Store. We entered the bank at about 9:15 a. m. I was armed with a 45 caliber automatic and John was armed with a 22 caliber automatic. We had parked the getaway car around the corner from the bank. I remember it. It was a red car. After the robbery I met John in his room at 33–16 168th Street, Queens, where he gave me over $4,000 which he told me was my share of the loot. About a week later I went to Miami Beach, Florida where I spent most of this money and spent the rest in various bars.
   "I have read the above statement and it has been read to me. It is true and correct to the best of my knowledge."

constitutional right to remain silent, but rather left to the courts the duty of guarding against any invasion of that right. In resolving these questions of the adequacy of the warning we should give precedence to substance over form. See Tucker v. United States, 375 F.2d 363 (8th Cir.), cert. denied, 389 U.S. 888, 88 S.Ct. 128, 19 L.Ed.2d 189 (1967).

■ Lamia was told by Agent Myers that he "need not make any statement to us at [this] time. * * *" Admittedly the phrase "right to remain silent" was not used. The failure of the agent to use the phrase "right to remain silent," in the context of this case, is not so great a deviation from the *Miranda* standards as to make the warning ineffective. Here the warnings of the FBI agent were immediately preceded by warnings of the "right to remain silent" given by city Detective Mergner. Lamia, nevertheless, argues that being told that one has the "right to make no statement" is not equivalent to being told that one has the "right to remain silent," as the former connotes a formal statement to be made at some later time in a court or in a formal proceeding, while the latter is a method of advising a defendant he need not speak at all. We perceive no real· distinction between advising a person that he has the right to make no statement and that he has the right to remain silent; they mean substantially the same thing to any reasonable person. While there may be philological distinctions, they surely would not occur to anyone at a time of arrest. Anyone hearing either phrase would conclude that he did not have to say anything. The court in *Miranda* nowhere prescribed the exact words which must be used under all circumstances. Indeed, the court seemed to equate the two phrases when it coupled its warning of the "right to· remain silent" with the admonition that "any statement he does make may be used as evidence against him." 384 U.S. at 444, 86 S.Ct. at 1612. Nor do we believe that the court intended to limit the meaning of the word "statement" only to a "formal utterance reduced to writing," whatever may be meant by such a term. The court did require that a defendant know that he need not say anything and that anything he did say could be used in court against him. Lamia was fully apprised of these rights; to hold otherwise would be to elevate form over any substance. There is no point in giving such significance to the phrase "right to remain silent" that all other forms of expression conveying the same idea are precluded.

Furthermore, the court in its *Miranda* decisions indicated tacit approval of the language used by the FBI in its warnings. There the FBI warned, at the outset of an interview,

> "that he is not required to make a statement, that any statement may be used against him in court, that the individual may obtain the services of an attorney of his own choice, and, more recently, that he has a right to free counsel if he is unable to pay." 384 U.S. at 483, 86 S.Ct. at 1632.

■ There is no reason to believe that Lamia thought the phrase "need not make any statement" carried with it the meaning of a formal statement at a future court hearing. The warning was coupled with language of the present and contained phrases as "to us" and "at this time." Considering the words used in the circumstances of all that was said at the time, we find it to be a full and complete warning to Lamia that he need not make any statements to the officers present with him outside the bar. No purpose would be served by forbidding all questioning after an arrest unless a prescribed ritual is followed. It is enough that Lamia understood that he did not need to say anything and that he had a right to remain silent.

■ Lamia was also told that he had the "right to an attorney" and if he was not able to afford an attorney one would be appointed by the court. Lamia argues that this warning did not apprise him that he had the right to the "presence" of an attorney during questioning. We disagree. Lamia had been told

without qualification that he had the right to an attorney and that one would be appointed if he could not afford one. Viewing this statement in context, Lamia having just been informed that he did not have to make any statement to the agents outside of the bar, Lamia was effectively warned that he need not make any statement until he had the advice of an attorney.

Lamia relies heavily on United States v. Fox, 403 F.2d 97 (2d Cir. 1968) to support his interpretations of *Miranda.* We do not agree that *Fox* is controlling on these facts. In *Fox,* the warning given was as follows:

> "he didn't have to make any statement; that any statement that he made would be used in a court of law and he could consult an attorney prior to any question."

Most significantly, Fox was not told that he could have counsel appointed for him if he could not afford one. This omission tainted the entire warning and the effect it must have had on Fox. Furthermore the majority in that case, including a member of this panel, considered the warning that Fox "could consult an attorney prior to any question" to be affirmatively misleading since it was thought to imply that the attorney could not be present during the questioning. Whether this was correct or not, we think that *Fox* must be considered to rest on these two bases and that other observations in the opinion represented too formalistic an approach to *Miranda.* Here Lamia was apprised that an attorney would be appointed if he was unable to afford one, and was told nothing that would suggest any restriction on the attorney's functioning. We find that the substance of the required warnings was given.

██ Lamia next urges that even if adequate *Miranda* warnings were given, there is no proof that he knowingly waived his rights. We find that the government has met its burden of showing that Lamia knowingly waived his rights; it is unrealistic to expect the same degree of formality with respect to waiver in questioning "on the street" immediately after arrest as in the stationhouse.

██ Lamia, arrested in a bar at 8:40 P.M., asserted that he had been drinking vodka, 7–Up and beer chasers for approximately eight hours prior to his arrest. The district judge found, after testimony by Lamia and the agents involved, that Lamia was sufficiently possessed of his own faculties to understand what he was doing. The evidence to support this finding is ample.

Agent Myers testified that when he asked Lamia if he had understood the warning given, Lamia responded that he had. Myers testified that Lamia told him he had been in the bar only "a short time" and that he had thirty to forty dollars when he entered the bar. When arrested Lamia had thirty-one dollars plus change, hardly consistent with his claim that he had been drinking continuously for eight hours. Lamia's testimony was further discredited by his apparent ability to remember some facts and conversations which would not have been clear to him had he been inebriated. The only testimony that Lamia was not sober came from appellant himself. The agents said that although they could smell some liquor on his breath, Lamia was sober at the time the warnings were given. We agree with the district judge that Lamia "had control of his mental faculties," and knew what he was doing. We find that his affirmative response to Agent Myers' question regarding his understanding of his rights, as well as his subsequent actions, were a voluntary and knowing waiver of his rights.

In view of our conclusion that the admission of Lamia's confessions was not proscribed by *Miranda,* we find it unnecessary to consider the government's claim made for the first time at the argument of this appeal that the confessions were admissible under 18 U.S.C. § 3501, 82 Stat. 218 (1968).

██ Lamia makes two final points: (1) that there was insufficient

evidence to sustain the conviction, and (2) that there was no probable cause for the arrest. As to the first point, the testimony of the bank manager of the Jamaica Savings Bank together with Lamia's statements is sufficient answer to the claim that the evidence was insufficient. As to the issue of probable cause for the arrest, Lamia did not raise that point at the trial and it is not now a valid ground of objection. United States v. Indiviglio, 352 F.2d 276 (2d Cir. 1965), cert. denied, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966).

Affirmed.