**UNITED STATES of America,
Appellee,**

v.

**Michael Reeves FLOYD et al.,
Appellants.**

**Nos. 372, 376 and 378, Dockets 73–1957,
73–1969, 73–2009 and 73–2225.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 8, 1973.

Decided April 25, 1974.

Frederick P. Hafetz, New York City (Goldman & Hafetz, New York City, on the brief), for appellant Floyd.

Harvey A. Silverglate, Boston, Mass. (Norman S. Zalkind, Boston, Mass., on the brief), for appellant Lesavoy.

Jesse Berman, New York City, for appellant Miller.

John J. Kenney, Asst. U. S. Atty., New York City (Paul J. Curran, U. S. Atty., and S. Andrew Schaffer, Asst. U. S. Atty., New York City, on the brief), for appellee.

Before WATERMAN, FRIENDLY and TIMBERS, Circuit Judges.

TIMBERS, Circuit Judge:

■ Appellants Floyd, Lesavoy and Miller appealed from judgments of conviction entered upon jury verdicts after a seven day trial in the Southern District of New York, Charles M. Metzner, *District Judge,* finding the three appellants guilty on one count of conspiring to possess and distribute 1500 pounds of hashish,[1] in violation of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(B) and 846 (1970), and finding Lesavoy guilty on a second count of possessing 1099 pounds of hashish with intent to distribute it, in violation of the same substantive provisions of the Act.[2]

Of the numerous claims of error raised on appeal by appellants Floyd and Miller, we find the following to be the principal ones: (1) Floyd claims that there was no proof of an overt act in furtherance of the conspiracy prior to his withdrawal, and that the court erred in its charge on conspiracy; (2) Miller claims that certain of his incriminating statements were erroneously admitted in evidence because he was not given sufficient *Miranda* warnings, and that his sentence was based on improper considerations; and (3) both appellants claim that the court erred in discharging a juror and replacing him with an alternate part way through the trial. Other subordinate claims of error are also raised.

We affirm.

## I.

In view of the issues raised on appeal, the following summary of the events in late October and early November 1972 which culminated in the arrest of appellants is believed necessary to an understanding of our rulings on those issues.

On October 30, a government informant introduced Special Agent Hochman, of the Bureau of Narcotic and Dangerous Drugs (BNDD), to one James Krell at the latter's home in New Jersey. The purpose of the introduction was to enable Hochman, who was acting in an undercover capacity, to purchase hashish from Krell. Although the meeting had been arranged for the purchase of three pounds of hashish, Hochman told Krell that he was interested only in a larger amount. Krell said that he had access to 900 pounds of hashish located in

---

1. The indictment charged, and there was expert testimony at trial, that the Schedule I controlled substance here involved contained tetrahydrocannabinol and marihuana. 21 U.S.C. § 812 (1970). We refer to it as hashish in this opinion.

2. We have been informed that appellant Lesavoy died on March 12, 1974, after the argument of his appeal but before the filing of this opinion. We therefore vacate his judgment of conviction and remand his case to the district court with directions to dismiss the indictment as to him. Durham v. United States, 401 U.S. 481, 483 (1971).

Manhattan which was under the control of one Peter Axelrod and appellant Floyd. At the conclusion of this meeting, Hochman and Krell agreed that any sale would take place in a Manhattan hotel, but that Krell would do nothing until he was assured of payment.

Later that evening after Hochman had departed, Krell called Floyd and informed him that he had a buyer for large quantities of hashish. Floyd agreed to arrange a meeting with "the people in New York" and to call Krell back.

On the following evening, October 31, Floyd picked up Krell and drove him from his home in New Jersey to 270 Riverside Drive in Manhattan where they met Axelrod in the latter's apartment. There they discussed the terms of the sale of hashish to Hochman. Floyd then drove Krell back to his home in New Jersey.

Early the following morning, November 1, at 12:40 A.M., Hochman called Krell at his home.[3] Krell stated that the price for the hashish would be $450 per pound and that his supplier wanted to sell only 100 pounds. The two agreed, however, that Hochman would bring enough money to buy 500 pounds; that Krell would see what he could do; and that Hochman would go to New York later that day and call Krell. Krell then called Floyd, told him that Hochman wanted to buy several hundred pounds of hashish, asked him to come to his house that morning, and told him that he was expecting a call from Hochman during the day.

At about noon on November 1, Hochman called Krell and told him that he had a room in a Manhattan hotel. They agreed to meet there an hour later. Floyd, Krell, appellant Miller and one Steve Abelman then drove to the hotel in Miller's car. Floyd and Krell met Hochman and went with him to his room.

Once in the room it became clear that, although Hochman still wanted to buy 500 pounds, the suppliers for Floyd and Krell did not want to sell that much at the outset. Floyd told Hochman that, based on his conversation with Axelrod and one Steven Liebermann the day before, the initial delivery could not be more than 10 to 20 pounds.

In an attempt to break this impasse, Hochman agreed to "show" the money. He telephoned Special Agent Rottinger of the BNDD who entered Hochman's room and handed Floyd an envelope containing $100,000 in cash. Floyd and Krell looked through the envelope and returned it to Rottinger. Floyd then telephoned Axelrod twice. Hochman finally agreed to accept a first shipment of 50 pounds. Floyd sent Krell for the hashish and told him to have Axelrod call the hotel room before they returned with the hashish. Floyd and Hochman waited in the room.

Krell drove to 270 Riverside Drive with Miller and Abelman who had been waiting outside the hotel. After Krell met Liebermann and Axelrod in the latter's apartment, they went to a public phone booth from which Axelrod called Floyd and told him to call Axelrod back at the booth. He did. From a public phone in the lobby of Hochman's hotel, Floyd called Axelrod and handed the receiver to Hochman. Axelrod told Hochman that he would make an initial delivery of 50 pounds and then three or four subsequent trips, for a total of 400–500 pounds. He told Hochman that Krell would have the 50 pounds when he returned to the hotel. Floyd took the receiver and spoke to Axelrod. Floyd then told Hochman that Krell would arrive in half an hour with 50 pounds of hashish.

After this telephone conversation, Krell, Miller, Abelman, Liebermann and Axelrod drove to Columbus Avenue and 71st Street in Manhattan where Axelrod left the car. He returned a few minutes

---

3. Hochman recorded this telephone call to Krell. He also recorded subsequent meetings and telephone calls. Tapes and tran-scripts of these conversations were admitted in evidence at the trial.

later carrying a plaid suitcase which he and Krell placed in the trunk. Krell, Miller and Abelman then returned to Hochman's hotel. Krell told Miller and Abelman to drive around the corner with the "hash" until he determined that it was safe for them to enter. Krell went into the hotel, saw Hochman and was told that Floyd would meet them in the room. Krell said that the hashish was in the car circling around until he gave the word. They went to Hochman's room to wait for Floyd.

Meanwhile, Floyd had seen two men standing on the fire stairs outside Hochman's room and became suspicious. He left the hotel to telephone Axelrod. Floyd never returned to the room. Krell left Hochman to look for Floyd, found him outside the hotel and then called Hochman to tell him the deal was off for that day. Floyd called Axelrod to tell him what had happened.

Five days later, on November 6, Hochman again called Krell at his home. This started a new series of negotiations which culminated in a meeting between Hochman and Axelrod at a Manhattan restaurant on November 10. There emerged an agreement by Axelrod to sell 500 pounds of hashish to Hochman at Krell's house in New Jersey the following day in three shipments of 50, 150 and 300 pounds. Axelrod told Hochman that the hashish would be packed in seven to ten suitcases which would be supplied along with the hashish.

On November 11, Hochman went to New Jersey and called Krell to get the sale under way. Krell sent Miller and Abelman to New York in separate cars. The plan was that Miller would drive the second shipment of 150 pounds of hashish to New Jersey, but would not leave New York until after he was informed that the first 50 pounds had ar-

rived and that payment had been received. Abelman received a 50 pound suitcase of hashish from Axelrod and drove to Krell's house. Upon Hochman's arrival at Krell's house, he saw the hashish and persuaded Krell to call Axelrod and tell him he had seen the money (although in fact he had not.) Hochman then called "his man" in Krell's presence and told him to bring half the money. Upon the arrival of Hochman's "man", Krell and Abelman were arrested.

Meanwhile, Axelrod, Lesavoy and Miller drove in the latter's car to 229 Columbus Avenue in Manhattan. Axelrod and Lesavoy entered an apartment at that address and joined Liebermann there. While they were inside, Miller opened the trunk of his car. When the three others came out of the building, each carrying a 50 pound suitcase of hashish, all four were arrested.

Later, a search of Liebermann's Manhattan apartment pursuant to a warrant revealed fourteen additional suitcases containing more than 800 pounds of hashish. Half-filled suitcases of hashish also were found in Axelrod's apartment and in the apartment at 224 Columbus Avenue. Furthermore, Miller admitted after his arrest that he had 50 pounds of hashish in his car on November 1 and would have delivered it to the hotel if the delivery had not been called off.

On April 6, 1973,[4] a two count indictment was returned in the Southern District of New York charging Floyd, Lesavoy and Miller with violating the controlled substances provisions of the Comprehensive Drug Abuse Prevention and Control Act of 1970, as stated above.[5]

On April 27, 1973, after a seven day trial, the jury convicted the three appellants on the conspiracy count and, in addition, convicted Lesavoy on the substan-

---

4. Appellants originally were indicted on November 20, 1972. That indictment was superseded by the instant indictment returned on April 6, 1973.

5. In addition to the three appellants, the indictment named as co-defendants Abelman,

Axelrod, Krell, Liebermann and Paul Chaleff. Prior to trial, Abelman and Krell entered pleas of guilty to both counts. Axelrod and Liebermann were found guilty on both counts. The jury could not agree as to Chaleff and the court declared a mistrial as to him.

tive count, the court having dismissed the substantive count as against Floyd and Miller at the close of the government's case.

On June 8, 1973, the following sentences were imposed: Floyd was sentenced to a one year term of imprisonment, to be followed by a two year period of special parole; Lesavoy was sentenced on count one to a three year term of imprisonment, to be followed by a two year period of special parole, and on count two imposition of sentence was suspended and a three year term of probation was imposed to run consecutively to the sentence imposed on count one; Miller was given an effective sentence of six months imprisonment, to be followed by a two year period of special parole.[6] Appellants have been enlarged on bail pending appeal.

## II.

Floyd's essential claims of error are that the evidence did not establish an overt act in furtherance of the conspiracy prior to his asserted withdrawal and that the court erroneously charged the jury as to the requisite sequence of the agreement and the overt act. We disagree.

■ It is axiomatic that the essential elements of a conspiracy are an unlawful agreement and an overt act in pursuance of the agreement. United States v. Agueci, 310 F.2d 817, 828 (2 Cir. 1962), cert. denied, 372 U.S. 959 (1963). Floyd argues that there was no proof of an overt act prior to the formation of the unlawful agreement at the November 1 meeting between Floyd, Krell and Hochman in the latter's hotel room. And, since he claims to have terminated his involvement after this meeting, Floyd argues that an overt act was not proven while he was a member of the conspiracy. This argument misconstrues the evidence.

■ ■ Viewing the evidence in the light most favorable to the government, as we must at this stage, United States v. McCarthy, 473 F.2d 300, 302 (2 Cir. 1972), there was ample evidence from which the jury could have found that a conspiracy existed on October 30 when Krell called Floyd to tell him he had a buyer for large quantities of hashish and Floyd agreed to arrange a meeting with "the people in New York", which he did the following night. In fact, Floyd and Miller were among those who went to Hochman's hotel on November 1 to transfer hashish to Hochman; and the hashish was in Miller's car trunk when the deal was postponed.

Since the conspiracy charged in the indictment was not an agreement with Hochman but an agreement among the defendants to engage in the sale of hashish, there was ample evidence from which the jury could have found the existence of such an agreement prior to November 1 and that the meeting in the hotel on that day was a step in carrying it out.[7]

Floyd's related argument is that the court's charge permitted the jury to find that the November 1 meeting constituted proof of both the first overt act and the conspiratorial agreement itself. This not only ignores the evidence to which we have referred above, but it misinterprets the court's charge.

■ We hold, based upon our careful examination of the court's conspiracy charge as a whole, that the jury was clearly instructed that, before they could convict Floyd on the conspiracy count, they would have to find that the conspiracy existed prior to the commission

6. The same sentence as that imposed on Lesavoy was imposed on Axelrod and Liebermann, both of whom are serving their sentences.

Imposition of sentence on Abelman was suspended and he was placed on probation for a term of five years pursuant to 18 U.S.C. §§ 5010(a) and 4209 (1970).

7. Viewing the conspiracy in this manner also disposes of Miller's similar claim, since the November 1 meeting referred to in the first overt act was subsequent to the formation of the conspiracy.

of the first overt act, i. e. the November 1 meeting. The court charged that to prove a conspiracy the evidence must show that the defendants knowingly and willfully joined the conspiracy and that "one of the conspirators *thereafter* knowingly committed at least one of the overt acts charged in the indictment . . . ." (emphasis added). And, as to Floyd, the court specifically charged that "to convict defendant Floyd of the crime of conspiracy, you must find that the Government has proved overt act No. 1 beyond a reasonable doubt".

We are satisfied that the charge cannot fairly be said to have permitted the jury to find that the November 1 meeting constituted proof of both the overt act and the conspiratorial agreement.

### III.

Miller's chief claims of error are that certain statements he made to government agents after his arrest were erroneously admitted in evidence because he was not given sufficient *Miranda* warnings and that his sentence was based on improper considerations.

Following a pretrial suppression hearing, the court found that, after Miller had been arrested, handcuffed and placed in a government vehicle, a government agent advised him that "[h]e had a right to remain silent, anything he said can and would be ṕsed in a court of law, that he had a right to an attorney, if he could not afford an attorney, an attorney would be appointed for him by the court."[8] Miller stated that he understood his rights. The government agent admitted at the suppression hearing that he had not expressly informed Miller that he had a right to have an attorney present before any questioning began. After the warnings stated above had been given to Miller at BNDD headquarters, he made certain incriminating statements to the agent. The court, relying upon United States v. Lamia, 429 F.2d 373, 376–77 (2 Cir.), cert. de-

nied, 400 U.S. 907 (1970), held that these statements had been voluntarily given and were admissible.

Miller contends that because the warnings given him departed from those prescribed in Miranda v. Arizona, 384 U.S. 436, 467–79 (1966), his statements were inadmissible. We disagree. We hold on the particular facts of this case that Miller was adequately informed of his right to counsel and that the *Miranda* warnings were sufficient.

We have held that "words of *Miranda* do not constitute a ritualistic formula which must be repeated without variation", but that "[w]ords which convey the substance of the warning along with the required information are sufficient." United States v. Vanterpool, 394 F.2d 697, 698–99 (2 Cir. 1968). In United States v. Lamia, *supra*, 429 F.2d at 376, defendant was told that he had the "right to an attorney" and if he was not able to afford an attorney one would be appointed by the court. On appeal Lamia contended, as Miller does here, "that this warning did not apprise him that he had the right to the 'presence' of an attorney during questioning." *Ibid.* We rejected this contention and held that the warning given adequately informed Lamia of his rights under *Miranda*:

"Lamia had been told without qualification that he had the right to an attorney and that one would be appointed if he could not afford one. Viewing this statement in context, Lamia having just been informed that he did not have to make any statement to the agents  .  .  ., [he] was effectively warned that he need not make any statement until he had the advice of an attorney." 429 F.2d at 376–77.

Similarly in United States v. Pacelli, 470 F.2d 67, 72 (2 Cir. 1972), cert. denied, 410 U.S. 983 (1973), and in United States v. Carneglia, 468 F.2d 1084, 1092 (2 Cir. 1972), cert. denied, 410 U.S. 945 (1973), we rejected almost identical

---

8. United States v. Abelman, 73 Cr. 297 (S.D.N.Y., filed April 18, 1973) at 10 (unreported).

challenges to the admission of certain incriminating statements. In *Pacelli,* for example, we rejected a claim that appellant was not informed of his right to the presence of an attorney:

> "[t]he arresting officer warned Pacelli that he had a right to remain silent, that he did not have to make any statements to the officer, that he had a right to an attorney and that if he couldn't afford one the court would appoint an attorney for him. The instructions fully informed appellant of his rights." 470 F.2d at 72.

■ Here, since Miller also was informed of his rights to remain silent and to have an attorney, including an appointed one, we hold that he was adequately informed of his rights, that the district court correctly found a voluntary waiver,[9] and that Miller's statements were properly admitted in evidence.[10]

■ Miller further contends that the district court, in imposing upon him a six month jail sentence[11] under a statute that authorized a maximum five year term of imprisonment, improperly commented to Miller that "[y]ou exercised your right, which you have a right to do, to stand trial, but you didn't take the first step toward rehabilitation which was coming forward and telling the truth."

Although Judge Metzner should have carefully avoided any suggestion in his comments at the sentencing hearing that he was taking into account the fact that Miller had not pleaded guilty but had put the government to its proof, we are satisfied that the comment to Miller reflected no more than the judge's consid-

eration of whether Miller had taken the first step toward rehabilitation by recognizing that he was at fault. As the court said in Gollaher v. United States, 419 F.2d 520, 530 (9 Cir.), cert. denied, 396 U.S. 960 (1969):

> "the first step toward rehabilitation of an offender is the offender's recognition that he was at fault . . . . [N]o fault can be found of the judge who takes into consideration the extent of a defendant's rehabilitation at the time of sentence."

Upon the record as a whole, including Miller's lenient sentence, we hold that the judge did not penalize him for standing trial or for remaining silent, but that he did properly consider his need for rehabilitation.

## IV.

Appellants claim that the district court erred in discharging a juror who informed the court during the trial that he had a strong prejudice against wiretapping and felt that he could not render a fair judgment.

On the voir dire in empaneling the jury, the court informed the prospective jurors that part of the government's proof would consist of tape recordings, pursuant to a wiretap order, of conversations between a federal agent and the defendants, without the latters' knowledge. The court asked the veniremen whether "any of you object to the Government making such recordings, and would the fact that they made such recordings in any way affect your ability to render a true and just verdict in this case." No prospective juror responded.

9. Implicit in our holding that the district court correctly found that Miller had knowingly waived his rights, is the further holding that the court's factual finding that alleged coercion "did not affect the voluntariness of [Miller's] statements", United States v. Abelman, *supra* note 8, at 11, was not erroneous.

10. We also reject Floyd's claim that, as to him, there was a "contextual inculpation" in

the statements of Miller in violation of Bruton v. United States, 391 U.S. 123 (1968). Miller's statements, before being admitted, were redacted so that there was no reference to any person other than Miller.

11. Miller actually was sentenced to seven months with the provision that he be confined in a jail type institution for six months. The remainder of the sentence was suspended.

On the fifth day of the trial, however, one juror sent a letter to the judge stating that, because he had a strong prejudice against the use of wiretapping devices, he could not render a fair judgment.[12] After conferring with counsel and questioning the juror in their presence, the court discharged the juror and replaced him with an alternate, on the ground that the juror had "misled counsel" at the time of his selection and "feels that '[he] cannot render a fair judgment in this case.'" Appellants contend that the court's discharge of the juror under these circumstances constitutes error. We disagree.

■■ The court is authorized, pursuant to Fed.R. Crim.P. 24(c), any time before the jury retires to consider its verdict, to replace jurors with alternates if the court finds that jurors are "unable or disqualified to perform their duties." This substitution of an alternate juror for reasonable cause is the prerogative of the court and does not require the consent of any party. United States v. Ellenbogen, 365 F.2d 982, 989 (2 Cir. 1966), cert. denied, 386 U.S. 923 (1967). A juror may be discharged for misleading the court or when facts are presented which convince the court that a juror's ability to perform his duty has become impaired. United States v. Maxwell, 383 F.2d 437, 443 (2 Cir. 1967), cert. denied, 389 U.S. 1057 (1968); United States v. Gottfried, 165 F.2d 360 365 (2 Cir.), cert. denied, 333 U.S. 860 (1948); United States v. Cameron, 464 F.2d 333, 335 (3 Cir. 1972).

■ By replacing the juror here in question with an alternate, after conferring with the juror and with counsel, the court acted well within its discretion. Absent a clear showing of prejudice, we will not presume it. United States v. Maxwell, *supra*, 383 F.2d at 443; United States v. Ellenbogen, *supra*, 365 F.2d at 989; United States v. Zambito, 315 F.2d 266, 269 (4 Cir.), cert. denied, 373 U.S. 924 (1963).

Here there was no showing whatsoever of prejudice. The juror had failed to respond to the court's voir dire question relating to wiretaps. He thereafter informed the court that he could not render a fair judgment. Under these circumstances, we hold that the district court properly discharged the juror. Indeed, we fail to see how the court could have done otherwise.

We have considered appellants' other claims of error and we find them without merit.

Appellants were convicted a year ago after a fair trial on the basis of overwhelming, uncontroverted evidence of serious crimes committed a year and a half ago. We order that the mandate issue forthwith.

. We affirm the convictions of appellants Floyd and Miller. We vacate the conviction of the deceased appellant Lesavoy and remand his case to the district court with directions to dismiss the indictment as to him.

12. The juror's letter which was handed to Judge Metzner stated:

"I am wrestling with a matter of conscience in connection with this trial that I feel I should call to your attention.

During the screening of jurors, you asked us to so state if there was any reason we felt we could not render a fair judgment. At the time, I was not aware that wiretapping and use of Kells (sic) would play the role in the trial that they have thus far.

Despite the apparent legality of the use of such devices—as the legality has been attested to in this trial—I have such a strong prejudice against their use that, as the trial has worn on, I've begun to recognize that I'm having difficulty suppressing my prejudice. It is clearly affecting my judgment and my attitude towards the evidence that is being presented.

I now feel that I cannot render a fair judgment in the case.

I don't know what the propriety is of my calling this to your attention but I feel compelled to do so."