UNITED STATES of America

v.

**William Standish BRADFORD, Ulysses José Orduz, Scott Paul Garman and William Edward Moran, Jr.**

**Crim. No. H 80–1.**

United States District Court, D. Connecticut.

June 19, 1980.

See also, D.C.Conn., 487 F.Supp. 1093.

Holly B. Fitzsimmons, Asst. U. S. Atty., Bridgeport, Conn., Richard Blumenthal, U. S. Atty. for the District of Connecticut, for the United States of America.

F. Mac Buckley, Buckley & Santos, Hartford, Conn., for defendant William Standish Bradford.

Richard L. Albrecht, Cohen & Wolf, P. C., Bridgeport, Conn., for defendant Ulysses José Orduz.

Maxwell Heiman, Furey, Donovan & Heiman, P.C., Bristol, Conn., for defendant Scott Paul Garman.

Arthur P. Meisler, Flaherty, Marder, Kallet & Meisler, Vernon, Conn., for defendant William Edward Moran, Jr.

JOSÉ A. CABRANES, District Judge:

RULING ON MOTION TO SUPPRESS

The four–count indictment in this case charges defendants Ulysses José Orduz and William Edward Moran, Jr. with the distribution of cocaine on or about December 11, 1979, and accuses Orduz, William Standish Bradford and Scott Paul Garman of the

knowing and intentional possession of cocaine with intent to distribute it, on or about January 3, 1980; the latter three defendants are also charged with conspiracy to violate the federal narcotics laws. The defendants have moved to suppress (a) a tape recording of a telephone conversation between Orduz and an informant cooperating with the Drug Enforcement Administration ("DEA"); (b) evidence seized from the persons of defendants Orduz, Bradford and Garman after their arrests on January 3, 1980; and (c) statements made by those defendants to law enforcement officers after they were arrested.

After an evidentiary hearing on this motion, at which the court heard the testimony of Special Agent Michael W. Meyrick, the DEA agent in charge of the investigation of this case, the court makes the findings of fact and conclusions of law set forth in the discussion below, and determines that the motion to suppress should be denied, except as to statements made by the defendants in response to interrogation by DEA agents after their arrests in Manchester, Connecticut on January 3, 1980, but before they were advised of their constitutional rights.

### The Tape Recording of Orduz' December 11 Telephone Conversation

On December 11, 1979, Orduz talked by telephone with a person who, unbeknownst to him, was an informant working with the DEA. The testimony of Special Agent Meyrick establishes that this informant, whose identity has not been disclosed,[1] voluntarily came to the offices of the DEA to assist it in its investigation of possible violations of the narcotics laws by Orduz.[2] The informant told Meyrick that he had arranged to purchase approximately one ounce of cocaine from Orduz and that he was going to place a telephone call to

Orduz to establish the time and place of the purchase.[3] The informant then made the call, in Meyrick's presence, in the DEA's Hartford office.[4] His conversation with Orduz was simultaneously recorded on a DEA tape recorder and monitored by Meyrick, who listened to it through an earphone.[5]

Although the government did not obtain a warrant authorizing the DEA to record and monitor the telephone conversation, its eavesdropping was permissible, under both Title III of the Omnibus Crime Control and Safe Streets Act of 1968 and the Fourth Amendment to the United States Constitution, if one of the parties to the conversation gave his prior consent to it. *See* 18 U.S.C. §§ 2511(2)(c), (d); *United States v. White*, 401 U.S. 745, 751, 91 S.Ct. 1122, 1125, 28 L.Ed.2d 453 (1971). As *White* makes clear, "however strongly a defendant may trust an apparent colleague, his expectations in this respect are not protected by the Fourth Amendment when it turns out that the colleague is a government agent regularly communicating with authorities." *United States v. White, supra*, 401 U.S. at 749, 91 S.Ct. at 1125. *See also Hoffa v. United States*, 385 U.S. 293, 302–03, 87 S.Ct. 408, 413–14, 17 L.Ed.2d 374 (1966); *Lopez v. United States*, 373 U.S. 427, 438–40, 83 S.Ct. 1381, 1387–88, 10 L.Ed.2d 462 (1963); *United States v. Bonanno*, 487 F.2d 654, 657–58 (2d Cir. 1973). The admissibility of the December 11 telephone conversation therefore depends upon the consent of the informant.

Orduz' contention that the government has failed to establish such consent to the interception and monitoring of the informant's conversation with Orduz is without merit. Although the informant's own testimony on this issue would have had greater probative force than that of Special Agent Meyrick, "there is no rule requiring the production of the best witness" on the ques-

---

1. The court previously denied the defendants' motion for the disclosure of the identity of this informant, who will not be a witness at the trial of Orduz, Bradford and Garman on Counts II - IV of the indictment.

2. Transcript of Hearing on Motion to Suppress ("Tr.") 14.

3. Tr. 15.

4. *Id.*

5. Tr. 12.

tion of consent to such eavesdropping. *United States v. Bonanno, supra*, 487 F.2d at 659. *See also United States v. Fuentes*, 563 F.2d 527, 533 (2d Cir.), *cert. denied*, 434 U.S. 959, 98 S.Ct. 491, 54 L.Ed.2d 320 (1977); *United States v. Gladney*, 563 F.2d 491, 493 (1st Cir. 1977). In a case such as this one, "it will normally suffice for the Government to show that the informer went ahead with a call after knowing what the law enforcement officers were about." *United States v. Bonanno, supra*, 487 F.2d at 658–59. That test was clearly met by Meyrick's testimony–which was not shaken upon cross–examination–that the informant (a) voluntarily came to the DEA with the information that Orduz had agreed to sell him cocaine; (b) stated that he intended to call Orduz to make specific arrangements for that transaction; and (c) went ahead with the telephone call, from the DEA's office, in Meyrick's presence, while Meyrick was listening to the conversation through an earphone. The preponderance of the evidence on this point establishes the informant's consent to the taping and monitoring by the DEA of his conversation with Orduz. The eavesdropping was therefore permissible under the applicable statute and the Fourth Amendment.

### The Post–Arrest Searches and Seizures

Bradford, Garman and Orduz have challenged the admissibility of evidence seized from them at the DEA office in Hartford, approximately thirty minutes after their arrests at or near a McDonald's restaurant in Manchester, Connecticut on January 3, 1980.

Special Agent Meyrick had arranged to purchase cocaine from Bradford and Orduz at the McDonald's restaurant that day.[6] In the course of the transaction, Meyrick went into the men's room of the restaurant with Bradford to inspect the cocaine which Bradford had agreed to sell him, while Garman, Orduz and Special Agent Gary Sloboda of the DEA (who had accompanied Meyrick to the restaurant and whose true identity apparently was likewise undisclosed) sat at a table.[7] Garman made two attempts to enter the men's room while Bradford and Meyrick were in it; in each case, Special Agent Sloboda blocked his path.[8] Garman then, in Meyrick's words, "walked over and met with Mr. Orduz, who was seated at the table, at which point Mr. Orduz got up, walked over to the men's room and did enter the men's room."[9] Orduz "advised Mr. Bradford that he didn't like the looks of things outside the men's room, and . . . suggested that the transaction be terminated."[10] Bradford expressed his agreement with this suggestion, and put the cocaine which he had shown to Meyrick back into a shoulder bag that he was carrying.[11] Meyrick, Orduz and Bradford then left the men's room; when Orduz and Bradford "headed for the nearest exit," Meyrick signaled to other undercover DEA agents in the restaurant and parking lot to arrest Bradford, Orduz and Garman.[12]

Orduz was arrested in the parking lot of the restaurant by DEA agents.[13] Garman, who had gone into the men's room after the others left it, was arrested there.[14] Bradford ran from the parking lot to a nearby wooded or brushy area abutting Interstate Route 84, throwing his shoulder bag and another, unidentified, object away as he ran.[15] DEA agents pursued Bradford and, after a chase which lasted about thirty seconds, subdued and arrested him.[16] After their arrests, the defendants were subjected to "pat–down" searches for weapons and

**6.** Tr. 32–37.

**7.** Tr. 44.

**8.** Tr. 44–45.

**9.** Tr. 45.

**10.** Tr. 44.

**11.** Tr. 45.

**12.** *Id.*

**13.** Tr. 46, 119.

**14.** Tr. 46.

**15.** Tr. 46–47.

**16.** Tr. 46–48.

contraband.[17] With the exception of a canister of "mace" found in Bradford's pocket, nothing was seized as a result of these searches.[18]

Bradford, Orduz and Garman were then driven to the DEA office in Hartford, approximately fifteen minutes away, where they were fingerprinted, photographed and asked for their personal histories.[19] DEA agents conducted strip searches and searched the wallets and papers carried by the suspects; some of this material was seized as evidence.[20] The defendants contend that the searches and seizures conducted in Hartford violated their Fourth Amendment rights.

Searches such as the ones under attack here, which are made without the prior approval of a judge or magistrate, "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well–delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). *See also Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2031–32, 29 L.Ed.2d 564 (1971). One of those exceptions to the search warrant requirement applies to "searches incident to arrest." The Supreme Court expounded upon the principle governing such searches in *Chimel v. California*, 395 U.S. 752, 762–63, 89 S.Ct. 2034, 2039–40, 23 L.Ed.2d 685 (1969):

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest

itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area "within his immediate control"–construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

In *United States v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467, 477, 38 L.Ed.2d 427 (1973), the Court emphatically held that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a "reasonable" search under that Amendment.

*See also Gustafson v. Florida*, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973).

In light of *Chimel* and *Robinson*, the initial "pat-down" searches of Orduz, Bradford and Garman were clearly constitutional. They occurred immediately after lawful[21] arrests, and were limited in scope to the defendants' persons. These searches have not been challenged.[22] However, the defendants contend that the subsequent searches conducted at the Hartford office of the DEA, although concededly restricted

---

**17.** Tr. 50.

**18.** Tr. 50·51, 120.

**19.** Tr. 35, 57, 119·121; Tr. 51 52.

**20.** Tr. 52, 56 ·58.

**21.** The defendants have not challenged the lawfulness of the arrests. The authority of DEA agents to make warrantless arrests on the basis of probable cause was granted by Congress in 21 U.S.C. § 878(3), and the defendants have not argued, much less established, that the arrests

of Orduz, Bradford and Garman at the Manchester McDonald's were made without probable cause for the belief by the DEA agents that the defendants had violated the federal narcotics laws.

**22.** Nor have the defendants challenged other searches made by agents of the DEA, such as the search, for which a warrant had been obtained, of the car driven by Bradford to the McDonald's restaurant in Manchester. *See* Tr. 69 72, 173–74.

to their persons and clothing, were not "incident to arrest" because they were too remote in time and place from the arrests to fall within the doctrine of *Chimel* and *Robinson.* See generally *Shipley v. California,* 395 U.S. 818, 819–20, 89 S.Ct. 2053, 2054, 23 L.Ed.2d 732 (1969) (per curiam); *Stoner v. California,* 376 U.S. 483, 486, 84 S.Ct. 889, 891, 11 L.Ed.2d 856 (1964); *Preston v. United States,* 376 U.S. 364, 367, 84 S.Ct. 881, 883, 11 L.Ed.2d 777 (1964). Accordingly, the defendants argue, the warrantless searches in Hartford violated their Fourth Amendment rights.

■ The defendants' argument ignores *United States v. Edwards,* 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974). In that case, the Supreme Court held that the Fourth Amendment did not bar the warrantless seizure of an arrestee's clothing while he was in jail, approximately ten hours after his arrest, where (as here) the evidence in question could lawfully have been seized, without a warrant, in a search incident to arrest immediately after the defendant had been apprehended. The Court expressly held that "searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention." *United States v. Edwards, supra,* 415 U.S. at 803, 94 S.Ct. at 1237. It was therefore "reasonable" within the meaning of the Fourth Amendment for the police to proceed to search the defendant while he was in their custody without obtaining a search warrant, even though they had ample time to do so. The rule of *Edwards* applies to this case:

> [O]nce the accused is lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may lawfully be

searched and seized without a warrant even though a substantial period of time has elapsed between the arrest and subsequent administrative processing, on the one hand, and the taking of the property for use as evidence, on the other.

*United States v. Edwards, supra,* 415 U.S. at 807, 94 S.Ct. at 1239.

The warrantless searches conducted by DEA agents in Hartford were permissible under the Fourth Amendment as interpreted in *Edwards.* The defendants' request that the fruits of those searches be suppressed must therefore be rejected.

### *The Defendants' Post–Arrest Statements to DEA Agents*

■ The defendants were not advised of their constitutional rights, as required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), until they were in the vehicles which took them to Hartford. Accordingly, any statements made in response to interrogation at the scene of the arrests in Manchester–such as Bradford's post–arrest identification of himself as "William Standish" [23]–must be suppressed.

The defendants were advised of their constitutional rights while en route from Manchester to the Hartford office of the DEA.[24] Specifically, Special Agent David Petz informed Orduz and Garman of their rights by reading from a form known as a "BND–13–A," while Special Agent Wayne Roques read from the same form to Bradford.[25] The form used by the agents[26] contains the following statement:

> Before we ask you any questions, it is my duty to advise you of your rights:
>
> 1. Do you understand that you have the right to remain silent?
>
> 2. Do you understand that anything you say can and will be used against you in court or other proceedings?

---

**23.** Tr. 58, 143–44.

**24.** Tr. 49.

**25.** Tr. 49, 78–79, 87–89.

**26.** A form BND–13–A was marked as Government's Exhibit 2 at the hearing. The letters "BND" apparently refer to the Bureau of Nar-

cotics and Dangerous Drugs, the predecessor of the DEA in investigating violations of, and enforcing, the federal criminal laws regarding narcotics. The form's reference to the "U. S. Commissioner"–a position replaced by that of United States Magistrate in 1968, Pub.L. 90–578, 28 U.S.C. § 636–betrays its age.

3. Do you understand that you have the right to talk to a lawyer before we ask you any questions and to have him with you during questioning?

4. If you cannot afford or otherwise obtain a lawyer and you want one, a lawyer will be appointed for you by the U.S. Commissioner or the Court and we will not ask any question until he has been appointed.

5. If you decide to answer now, with or without a lawyer, you still have the right to stop questioning at any time or to stop the questioning for the purpose of consulting a lawyer.

HOWEVER . . .

You may waive the right to advice of counsel and your right to remain silent, and you may answer questions or make a statement without consulting a lawyer if you so desire.

Special Agents Petz and Roques told Special Agent Meyrick that the defendants indicated that they understood the rights which had been read to them. The court concludes from the uncontradicted evidence before it that the defendants had been fully advised of their rights, as required by *Miranda*, by the time they arrived at the DEA's Hartford office.[27]

At that office, Meyrick attempted to advise Orduz of his constitutional rights again, before he interviewed Orduz. At the hearing on this motion, Meyrick testified:[28]

I told Mr. Orduz that he had the right to remain silent, and that he did not have to make any statement. I told him that he also had the right to an attorney and to have the attorney present during questioning, if he so desired. I told him if he could not afford an attorney, the Government had an obligation to provide one for him.

I also advised Mr. Orduz that he could waive his rights, as I just explained, and that he could make statements, and that he could stop answering questions at any time and he was under no obligation to continue answering questions.

I then asked him if he understood his rights, and he said that he did.

Although this recitation omitted reference to the fact that any statement made by Orduz could later be used against him, Meyrick testified without contradiction that he informed Orduz of this fact before he began to question the defendant. On *voir dire* examination by Orduz' counsel, the DEA agent testified as follows:[29]

Q: . . . You did not give the defendant any further rights other than those that you have testified to, is that not correct?

A: That's not correct.

Q: You gave him further rights?

A: Yes.

Q: And what further rights did you give him?

A: Before he made any statement, I asked him if he understood if anything that he said could be used against him. And he said, yes.

The court rejects the insinuations of defense counsel that this testimony was a fabrication concocted by Meyrick as he was testifying.[30] Crediting the testimony of the

---

**27.** Although it was hearsay, Special Agent Meyrick's testimony as to the warnings given the defendants by other DEA agents was clearly admissible at the hearing on the motion to suppress. *See* Rules 104(a), 1101(d)(1), Fed.R. Evid.; *United States v. Matlock*, 415 U.S. 164, 173 74, 94 S.Ct. 988, 994, 39 L.Ed.2d 242 (1974). While the court would have given greater weight to non hearsay testimony by Special Agents Petz and Roques on this point, it finds that the testimony of Special Agent Meyrick, who was a highly credible witness, suffices to establish that his colleagues read the defendants their rights from Form BND 13 A.

**28.** Tr. 75.

**29.** Tr. 79.

**30.** *Id.* The court therefore need not determine whether the omission of the advice that statements by a defendant might be used against him would be so substantial a deviation from *Miranda* as to render inadmissible subsequent statements by the defendant. *Cf. United States v. Floyd*, 496 F.2d 982, 988 89 (2d Cir.), *cert. denied*, 419 U.S. 1069, 95 S.Ct. 654, 42 L.Ed.2d 664 (1974); *United States v. Olivares-Vega*, 495 F.2d 827, 829 (2d Cir.), *cert. denied*, 419 U.S. 1020, 95 S.Ct. 494, 42 L.Ed.2d 293 (1974);

Special Agent, the court finds that Orduz was given full *Miranda* warnings twice before he gave any statement to the government at the Hartford office of the DEA— once in the car which took him from Manchester to Hartford and again in the DEA's office by Meyrick.

█ The defendants contend that their waivers of constitutional rights after being read the *Miranda* warnings were ineffective because they did not execute written forms of waiver concededly available to the DEA agents who questioned them. This argument is without merit. The formal execution of a written waiver is not a prerequisite to a finding that there has been a knowing, intelligent and voluntary waiver by a defendant who has been advised of his rights as required by *Miranda*. *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); *United States v. Boston*, 508 F.2d 1171, 1175 (2d Cir. 1974), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2401, 44 L.Ed.2d 669 (1975). The evidence presented to the court at the hearing on this motion establishes that the defendants understood their rights before they answered any questions put to them at the DEA office in Hartford by agents of the DEA, and that they communicated this fact to the agents. Accordingly, they knowingly, intelligently and voluntarily waived their rights before making statements to the agents in the course of custodial interrogation there. *See United States v. Cassino*, 467 F.2d 610, 620 n. 30 (2d Cir. 1972), *cert. denied*, 410 U.S. 928, 93 S.Ct. 1363, 35 L.Ed.2d 590 (1973).

In sum, any statements made by the defendants in response to interrogation after their arrests in Manchester but before they were advised of their constitutional rights while en route to Hartford are inadmissible. However, the defendants' contention that statements made to DEA agents in Hartford, after being informed of their rights, are likewise inadmissible is without merit.

### Conclusion

For the reasons stated herein, the court finds that the government has established by a preponderance of the evidence [31] (a) the consent of its informant to the recording and monitoring by the DEA of his telephone conversation with defendant Orduz; (b) the lawfulness of the searches and seizures challenged by the defendants; and (c) that statements made by the defendants to DEA agents at that agency's Hartford office were made voluntarily, after effective waivers of their rights under *Miranda v. Arizona, supra*. The court therefore grants the defendants' motion only to the extent that statements made by the defendants in response to interrogation while the defendants were in the custody of the DEA but before they were advised of their *Miranda* rights during their ride from Manchester to Hartford are suppressed. In all other respects, the motion to suppress is denied.

It is so ordered.

█

*United States v. Carneglia*, 468 F.2d 1084, 1092 (2d Cir. 1972), *cert. denied*, 410 U.S. 945, 93 S.Ct. 1391, 35 L.Ed.2d 611 (1973); *United States v. Lamia*, 429 F.2d 373, 374–76 (2d Cir.), *cert. denied*, 400 U.S. 907, 91 S.Ct. 150, 29 L.Ed.2d 146 (1970); *United States v. Vanterpool*, 394 F.2d 697, 698–99 (2d Cir. 1968).

**31.** *See United States v. Matlock*, 415 U.S. 164, 177, 94 S.Ct. 988, 996, 39 L.Ed.2d 242 (1974). At a suppression hearing, the initial burdens of production and persuasion are borne by the movant. However, where, as here, the defendants moving to suppress evidence challenge the admissibility of the fruits of a warrantless search, those burdens are shifted to the government. *See United States v. Arboleda*, —— F.2d at ·· (No. 79–1278, 2d Cir. June 9, 1980). There is no need to determine whether the burdens of production and persuasion on the other issues raised by the instant motion were also shifted to the government, for even if they were the government's burdens to carry, they have been met by a preponderance of the credible evidence introduced at the hearing in this case.